Michael F. Snyder, Esquire
John J. Sullivan, Esquire
VOLPE AND KOENIG, P.C.
United Plaza, 30 S. 17th St.
Philadelphia, Pa 19103
Tele: 215-568-6400
Fax: 215-568-6499

*Attorneys for Plaintiff,*
*Buzz Bee Toys, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BUZZ BEE TOYS, INC., | CIVIL ACTION NO. |
| Plaintiff, | 1:14-cv-01948-JBS-KMW |
| v. | |
| | Hon. Jerome B. Simandle, U.S.D.J. |
| | Hon. Karen M. Williams, U.S.M.J. |
| SWIMWAYS CORPORATION and TARGET CORPORATION, | |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AGAINST DEFENDANTS SWIMWAYS CORPORATION AND TARGET CORPORATION

Table of Contents

I.  INTRODUCTION ................................................................................1

II.  FACTUAL BACKGROUND..........................................................................3

    A.  Buzz Bee's WATER WARRIORS Line Featuring Buzz Bee's WATER WARRIORS Trade Dress .......................................................3

        1.  The AVENGER Water Squirting Toys ......................................3

        2.  The KWIK GRIP XL Water Squirting Toys ..............................5

        3.  The ARGON Water Squirting Toys ...........................................7

        4.  The XENON Water Squirting Toys............................................9

    B.  Swimways Infringement of the Avenger Trade Dress and the KWIK GRIP XL Trade Dress ..........................................................11

        1.  Swimways' Infringing STORM Water Squirting Toy .............11

        2.  Swimways' Infringing STRYKER Water Squirting Toy .........12

        3.  Swimways' Infringing TSUNAMI Water Squirting Toy .........14

        4.  Swimways' Infringing AVALANCHE Water Squirting Toy ..14

        5.  Summary of Swimways' Infringing Line ..................................15

    C.  Target Replaces Buzz Bee's WATER WARRIORS Line with an Identical Knock-Off ........................................................................16

    D.  Preliminary Injunctive Relief Requested ...........................................17

II.  LEGAL STANDARDS .......................................................................17

    A.  Trade Dress Infringement under the Lanham Act...............................18

i

III.  LEGAL ARGUMENT ................................................................20

    A.  Buzz Bee Will Likely Succeed On The Merits In Demonstrating Trade Dress Infringement...............................................................20

        1.  Buzz Bee's WATER WARRIORS Trade Dress Is Both Inherently Distinctive and Has Achieved a Strong Secondary Meaning ..............................................................21

        2.  The Buzz Bee's WATER WARRIORS Trade Dress Is Non-Functional...............................................................26

        3.  There Is A Likelihood Of Confusion Between Buzz Bee's WATER WARRIORS Trade Dress And Swimways' Infringing Trade Dress ..............................................................27

            a.  The Trade Dress at Issue is Legally Identical (Lapp Factor #1)...............................................................28

            b.  Buzz Bee's WATER WARRIORS Trade Dress Is Strong (Lapp Factor #2) ...............................................................31

            c.  The Goods Are Identical, Inexpensive, Targeted To a Young Class of Consumers, and Sold to Similar Consumers Through Similar Channels of Trade (Lapp Factors #3, #7, #8 and #9) ...............................................................32

            d.  Swimways Intentionally Copied the AVENGER Trade Dress and KWIK GRIP XL Trade Dress ......................33

    B.  Immediate Injunctive Relief is Warranted in this Case ......................34

        1.  Plaintiff Will Suffer Irreparable Injury .....................................34

        2.  The Balance of Hardships Favors Immediate Injunctive Relief36

        3.  The Public Interest Favors Immediate Injunctive Relief..........37

IV.  CONCLUSION.................................................................38

# Table of Authorities

## Cases

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
237 F.3d 198 (3d Cir. 2000). .........................................................19, 28, 29

A&H Sportswear Co. v. Victoria's Secret Stores, Inc.*,
166 F.3d 197, 202 (3d Cir. 1999) ...........................................................28, 30

*Am. Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471 (3d Cir. 1996) (*en banc*)...............................................17

*Bill Blass, Ltd. v. SAZ Corp.*,
751 F.2d 152 (3d Cir. 1984) ......................................................................38

*Blumenthal Distrib. v. Exec. Chair, Inc.*, CV-10-1280 (CBA), 2010 U.S. Dist. LEXIS 142193 (E.D.N.Y. Nov. 9, 2010) ......................................................24

*Carolina Enterprises v. Coleco Indus.*,
No. 81-214, 1981 U.S. Dist. LEXIS 15824 (D.N.J. Mar. 2, 1981)...............25

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001). .........................................................19, 30, 33

*Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*,
414 F. Supp. 1003 (E.D. Pa. 1976).............................................................36

*Coach, Inc. v. Fashion Paradise, LLC*, Civil No. 10-4888 (JBS/KMW),
2012 U.S. Dist. LEXIS 7429 (D.N.J. Jan. 20, 2012)....................................19

*CPC Int'l, Inc. v. Caribe Food Distributors*,
731 F. Supp. 660 (D.N.J. 1990)..................................................................22

*Dominion Bankshares Corp. v. Devon Holding Co.*,
690 F. Supp. 338 (E.D. Pa. 1988)..............................................................34

*Dranoff-Perlstein Assoc. v. Sklar*,
967 F.2d 852 (3d Cir. 1992) ......................................................................27

iii

*Florence Manufacturing Co. v. J. C. Dowd & Co.*,
    178 F. 735 (2d Cir. 1910) ...............................................................................33

*Fisons Horticulture, Inc. v. Vigoro Indus, Inc.*,
    30 F.3d 466 (3d Cir. 1994) ..............................................27, 28, 32, 33

*Ford Motor Co. v Summit Motor Prods., Inc.,*
    930 F.2d 277 (3d Cir. 1991). .......................................................................27

*Franklin Mint, Inc. v. Franklin Mint, Ltd.*,
    331 F. Supp. 827 (E.D. Pa. 1971)...............................................................36

*Freedom Card, Inc. v. JP Morgan Chase & Co.*,
    432 F.3d 463 (3d Cir. 2005) ........................................................................20

*Freixenet, S.A. v. Admiral Wine & Liquor Co.*,
    731 F.2d 148 (3d Cir. 1984). ......................................................................26

*Fun-Damental Too v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997) ........................................................................31

*Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc.*,
    94 F. Supp. 2d 566 (E.D. Pa. 1999)............................................................31

*Good 'N Natural v. Nature's Bounty, Inc.*, Civ. A. No. 87-662, 1990 U.S. Dist.
    LEXIS 11414, 1990 WL 127126 (D.N.J. Aug. 30, 1990)...........................25

*Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, No. 81-1431,
    1981 U.S. Dist. LEXIS 17757 (D.N.J. Oct. 20, 1981) ................................30

*Ideal Toy Corp. v. Plawner Toy Mfg. Co.*,
    685 F.2d 78 (3d Cir. 1982) ...........................................................22, 26, 30

*International Kennel Club, Inc. v. Mighty Star, Inc.*,
    846 F.2d 1079 (7th Cir. 1988) ..............................................................34, 35

*Interpace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983) ................................................................*passim*

iv

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
    456 U.S. 844 (1982)..................................................................22, 26

*Kampgrounds of America, Inc. v. North Delaware A-OK Campground, Inc.*,
    415 F. Supp. 1288 (D. Del. 1976), *aff'd without op.*, 556 F.2d 566
    (3d Cir. 1977) ...............................................................................22

*Katiroll Co. v. Kati Roll & Platters, Inc.*,
    Civil Action No. 10-3620 (GEB), 2011 U.S. Dist. LEXIS 9571,
    (D.N.J. Feb. 1, 2011) ...................................................................32

*Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*,
    695 F. Supp. 787 (D.N.J. 1988) ............................................25, 30

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700  (3d Cir. 2004) ............................................29, 32, 33

*Lesportsac, Inc. v. K-Mart Corp.*,
    607 F. Supp. 183 (E.D.N.Y. 1984), *aff'd*, 754 F.2d 71 (2d Cir. 1985) .........36

*Locatelli, Inc. v. Tomaiuoli*,
    129 F. Supp. 630 (D.N.J. 1955)....................................................22

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
    511 F.3d 350 (3d Cir. 2007) ............................................17, 18, 30

*Opticians Ass'n of America v. Independent Opticians of America*,
    920 F.2d 187 (3d Cir. 1990) ................................................*passim*

*Paddington Corp. v. Attiki Importers & Distribs., Inc.*,
    996 F.2d 577 (2d Cir. 1993) .........................................................21

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
    469 U.S. 189 (1985).....................................................................37

*Pappan Enter, v. Hardee's FoodSys., Inc.*,
    143 F.3d 800 (3d Cir. 1998) .........................................................37

*Perry Knitting Co. v. Meyers*,
    120 F. Supp. 880 (S.D.N.Y. 1954) ...............................................37

v

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (U.S. 1995) ............................................................26

*Rose Art Indus., Inc. v. Swanson*,
    235 F.3d 165 (3d Cir. 2000) .......................................................18

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
    968 F.2d 371 (3d Cir. 1992) ..................................................35, 37

*Sabinsa Corp. v. Creative Compounds, LLC*,
    609 F.3d 175 (3d Cir. 2010), ........................................28, 29, 33

*Secular Orgs. for Sobriety, Inc., v. Ullrich*,
    213 F.3d 1125 (9th Cir. 2000) ...................................................23

*Shire US Inc. v. Barr Labs. Inc.*,
    329 F.3d 348 (3d Cir. 2003) .......................................................18

*Stuart Hall Co., Inc. v. Ampad Corp.*,
    51 F.3d 780 (8th Cir. 1995) .......................................................23

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001)...............................................................18, 26

*Two* Pesos, v. Taco Cabana Inc.,
    505 U.S. 763, 780 (1992) .........................................................27

*Versa Prods. Co. v. Bifold Co. (Mfg.)*,
    50 F.3d 189 (3d Cir. 1995) .......................................................32

*Vision Sports, Inc. v. Melville Corp.*,
    888 F.2d 609 (9th Cir. 1989) ...............................................22, 25

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*,
    529 U.S. 205 (2000)............................................................18, 21

*Wolf Appliance, Inc. v. Viking Range Corp.*,
    686 F. Supp. 2d 878 (W.D. Wis. 2010) .....................................24

**Statutes**

15 U.S.C. § 1052(f) ...................................................................................23

15 U.S.C. § 1125(a) ..................................................................................18

New Jersey Counterfeiting Statute (N.J.S.A. § 56:3-13.16)....................................19

New Jersey Unfair Competition Statute (N.J.S.A. § 56:4-1)..................................19

**Treatises**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
     (4th ed. 2003) .....................................................................18, 29

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
     (4th Ed. 1996) ...............................................................................34

## I.    INTRODUCTION

Buzz Bee Toys, Inc. ("Buzz Bee") designs, creates, promotes, markets, distributes, and provides customer support for various water squirting toys and dart shooter toys.[1]  (Declaration of Jeffrey Zimmerman, President of Buzz Bee Toys, Inc. ("Zimmerman Dec.", ¶ 2).  Buzz Bee's toys are sold through Buzz Bee Toys (HK) Ltd., and promoted throughout the United States, including in this District.  *Id.*  Each of Buzz Bee's toys has a unique ornamental appearance constituting distinctive trade dress, that are featured in the packaging and display of the goods.  *Id.*, ¶¶ 8, 19, 32, 45, 58.  Buzz Bee is the owner of the trade dress in the packaging, display and appearance of Buzz Bee's toys, including the products at issue in this lawsuit, and all goodwill in the foregoing inures to Buzz Bee.  *Id.*, ¶ 3.

Buzz Bee has a line of WATER WARRIORS water squirting toys including the following models at issue in the present matter: the AVENGER, KWIK GRIP XL, ARGON and XENON.  Photographs of these products can be seen in Exhibits 1-8.  These products are referred to collectively as "Buzz Bee's WATER WARRIORS Line," and the trade dress for these products, described in greater detail below, is collectively referred to as "Buzz Bee's WATER WARRIORS Trade Dress."

---

[1]    BBT maintains a website at www.buzzbeetoys.com, where the full line of BBT products can be found.

2985361-2

As discussed in more detail herein, Defendant Swimways Corporation ("Swimways") has slavishly copied Buzz Bee's WATER WARRIORS Line and Buzz Bee's WATER WARRIORS Trade Dress, in an effort to illegally appropriate Buzz Bee's WATER WARRIORS Trade Dress that Buzz Bee has worked hard over the years to establish. Swimways' copies (referred to collectively as "Swimways' Infringing Line") can only be described as "knock-offs," as great care was taken to ensure that these knock-off products precisely copy the distinctive appearance of Buzz Bee's WATER WARRIORS Trade Dress. Swimways' Infringing Line is offered through Target stores. Swimways' knock-offs have replaced Buzz Bee's WATER WARRIORS Line on Target store shelves.

As demonstrated herein, Buzz Bee will likely succeed on the merits that Swimways is infringing Buzz Bee's WATER WARRIORS Trade Dress, competing unfairly with Buzz Bee, and that the balance or hardships weighs in favor of protecting the goodwill of Buzz Bee as the owner of Buzz Bee's WATER WARRIORS Trade Dress. The public interest will be served by restraining Swimways' infringement and unfair competition in order to prevent potential consumer confusion.

Permitting Swimways and Target to continue to offer Swimways' Infringing Line would allow Swimways to compete unfairly with Buzz Bee using copies of Buzz Bee's own designs. There is sufficient factual and legal support for the entry

2

of a preliminary injunction to restrain Swimways' willful infringement, as well as Target's sale of Swimways' Infringing Line.

## II.    FACTUAL BACKGROUND

### A.    Buzz Bee's WATER WARRIORS Line Featuring Buzz Bee's WATER WARRIORS Trade Dress

Buzz Bee strives to create and design toys having a distinctive appearance, to distinguish those toys as originating from Buzz Bee's "BUZZ BEE" and "WATER WARRIORS" brands. *Id*., ¶ 8. Buzz Bee has worked hard to establish and promote this distinctive appearance so that consumers appreciate the "BUZZ BEE" brand as the source of its toy products, and so that the toy products are set apart from Buzz Bee's competitors. *Id*.

### 1.    The AVENGER Water Squirting Toys

One member of the Buzz Bee's WATER WARRIORS Line is the AVENGER water squirting toy, part of Buzz Bee's WATER WARRIORS line, which has been in use since at least 2007. *Id*., ¶¶ 9-11. The AVENGER water squirting toy is packaged so that the product dominates the packaging, and is immediately perceived by consumers viewing the packaging, as shown in Exhibit 1[2] and below:

---

[2]    Zimmerman Dec., Exhibits A and B; Amended Verified Complaint (ECF No. 7), Exhibit A.

3



The AVENGER water squirting toys feature a distinctive appearance constituting a protectable trade dress.  Zimmerman Dec., ¶¶ 9-21.  The trade dress of the AVENGER water squirting toys can be articulated as follows, from the rear of the toy to the front of the toy: (i) a raised portion (A) along the top of the rear body portion, having a downwardly sloping body element (B) crossing forwardly along the rear body portion, a forward wavy top projection (C) and a forward wavy lower projection (D) with a wave-like arcuate design pointing rearward (E) formed between the top projection and the lower projection; (ii) an irregularly shaped inlay (F) having a forward point located in the rear body portion; (iii) a front and bottom body portion having a complementary wave-like shape (G) to meet the rear body portion, a grip portion having a raised back (H), a downwardly extending trigger guard portion (I) having an arcuate design inlay (J) pointing forward, a forward raised conical portion (K); (iv) a forward stock portion having three sloped ridges

(L); and (v) a cylindrical orange muzzle portion (M).  These elements are shown in the annotated photo shown as attached Exhibit 2.[3]

The packaging for the AVENGER water squirting toy prominently displays the foregoing features, so that a consumer viewing the packaging will immediately see and appreciate such features. Zimmerman Dec., ¶ 10.  The trade dress in the AVENGER water squirting toy, both with the packaging and removed from the packaging, is collectively referred to herein as the "AVENGER Trade Dress."

The AVENGER Trade Dress is wholly non-functional.  Zimmerman Dec., ¶ 21. The design elements of the AVENGER Trade Dress are not dictated by the internal water squirting operation of the toys. *Id*. Sales of the AVENGER water squirting toy featuring the AVENGER Trade Dress total 102,684 units, and $206,352 in sales.  *Id*., ¶¶ 12-13.

### 2.    The KWIK GRIP XL Water Squirting Toys

Other members of Buzz Bee's WATER WARRIORS Line are the KWIK GRIP XL water squirting toys, sold since at least 2003.  Zimmerman Dec., ¶¶ 22-34. The KWIK GRIP XL water squirting toys are pictured in Exhibit 3[4] and below, in their three-pack packaging.  The packaging for the KWIK GRIP XL water squirting toys prominently displays the appearance of the KWIK GRIP XL, so that

---

[3]    Amended Verified Complaint (ECF No. 7), Exhibit B.

[4]    Zimmerman Dec., Exhibits E, F; Amended Verified Complaint (ECF No. 7), Exhibit C.

5

a consumer viewing the packaging will immediately perceive the KWIK GRIP XL product as part of the packaging. *Id*., ¶ 23.



The KWIK GRIP XL water squirting toys feature a distinctive appearance constituting a protectable trade dress.[5] Zimmerman Dec., ¶¶ 22-34. The design elements of the KWIK GRIP XL water squirting toy at issue can be articulated as follows, from the rear of the toy to the front of the toy: (i) a semi-transparent dome fill tank; (ii) an oval body element overlaying the tank; (iii) a grip having two rear ridges; (iv) a trigger guard having a ridged insert at the front end of the trigger guard; (v) side and top arcuate body pieces; (vi) a futuristic coil design element having three forwardly-slanted "bubble" protrusions and a forwardly pointing "bubble" arrow portion; and, (vii) a ridged muzzle portion. These elements are shown in the annotated photo shown as Exhibit 4.[6]

The trade dress in the KWIK GRIP XL water squirting toy, both with the packaging and removed from the packaging, is collectively referred to herein as the "KWIK GRIP XL Trade Dress." The KWIK GRIP XL Trade Dress is entirely

---

[5]    The KWIK GRIP XL water squirting toy has two variations, one of which is the focus of this lawsuit.

[6]    Amended Verified Complaint (ECF No. 7), Exhibit D.

non-functional.  Zimmerman Dec., ¶ 34.  The design elements of the KWIK GRIP

XL Trade Dress are not dictated by the internal water squirting operation of the

toys.  *Id*.  Since 2003, sales of the KWIK GRIP XL water squirting toy featuring

the KWIK GRIP XL Trade Dress total at least 2,033,223 units, and $4,197,858 in

sales.  *Id*., ¶¶ 25-26.

### 3.    The ARGON Water Squirting Toys

Another member of Buzz Bee's WATER WARRIORS Line is the ARGON

water squirting toy, sold from 2004-2009.  Zimmerman Dec., ¶¶ 35-47.  The

ARGON water squirting toys are pictured in <u>Exhibit 5</u> and below.[7]



The packaging for the ARGON water squirting toys prominently displays

the appearance of the ARGON, so that a consumer viewing the packaging will

immediately perceive the ARGON product as part of the packaging.  *Id*., ¶ 36.

---

[7]     Zimmerman Decl., Exhibit I, J; Amended Verified Complaint (ECF No. 7), Exhibit E.

The ARGON water squirting toys feature a distinctive appearance constituting a protectable trade dress. Zimmerman Dec., ¶¶ 35-47. The design elements of the ARGON water squirting toys can be articulated as follows, from the rear of the toy to the front of the toy: (i) an upper tank portion [A] defining the upper rear body; (ii) an overlaying side portion [B] including an oval body element overlaying the tank [C], four futuristic bubble portions extending downward adjacent the oval body element [D], and two forwardly extending sweeping projections [E]; (iii) a grip having a ridged handle portion [F]; (iv) a lower central circular element [G] in front of the trigger guard, having radial projections and ridges [H] for a "sun-like" appearance; (v) a forward side element [I] including two bubble-like forwardly sloping upward projections [J] and a forward oval element [K]; (vi) a forwardly pointing L-shaped projection [L] along the upper front spine of the body, defining a triangular opening [M]; (vii) a conical muzzle portion having raised trapezoidal ridges [N]; and, (viii) a ridged forestock grip [O]. These elements are shown in the annotated photo shown as Exhibit 6.[8]

The trade dress in the ARGON water squirting toy, both with the packaging and removed from the packaging, is collectively referred to herein as the "ARGON Trade Dress." The ARGON Trade Dress is entirely non-functional. Zimmerman Dec., ¶ 47. The design elements of the ARGON Trade Dress are not dictated by

---

[8]     Amended Verified Complaint (ECF No. 7), Exhibit F.

the internal water squirting operation of the toys. *Id*. Since 2004, sales of the ARGON water squirting toy featuring the ARGON Trade Dress total over 368,000 units, and $1,584,000 in sales. *Id*., ¶¶ 38, 39.

### 4.    The XENON Water Squirting Toys

Another member of Buzz Bee's WATER WARRIORS Line is the XENON water squirting toy, sold from 2004-2009. Zimmerman Dec., ¶¶ 48-60. The XENON water squirting toys are pictured in <u>Exhibit 7</u> and below.[9]



The packaging for the XENON water squirting toys prominently displays the appearance of the XENON, so that a consumer viewing the packaging will immediately perceive the XENON product as part of the packaging. *Id*., ¶ 49.

The XENON water squirting toys feature a distinctive appearance constituting a protectable trade dress. Zimmerman Dec., ¶¶ 48-60. The design elements of the XENON water squirting toy at issue can be articulated as follows, from the rear of the toy to the front of the toy: (i) an upper tank portion [A]

---

[9]    Zimmerman Dec., Exhibits M, N; Amended Verified Complaint (ECF No. 7), Exhibit G.

defining the upper rear body; (ii) a rearwardly pointing fang-shaped portion [B] defining a sticker-receiving area [C]; (iii) a grip having a ridged handle portion [D]; (iv) a lower central circular element [E] in front of the trigger guard, having radial projections and ridges [F] for a "sun-like" appearance; (v) futuristic bubble projections [G] on the sides of the body between elements (ii) and (iv); (vi) a forward side arrow-head shaped element [H] having a notch [I] in the rear portion; (vii) a forwardly pointing L-shaped projection [J] along the upper front spine of the body, defining a triangular inset portion [K]; (vii) a conical muzzle portion having raised fins [L]; (viii) a ridges forestock grip [M]; and (ix) an oval rear side element [N]. These elements are shown in the annotated photo shown as Exhibit 8.[10]

The trade dress in the XENON water squirting toy, both with the packaging and removed from the packaging, is collectively referred to herein as the "XENON Trade Dress." The XENON Trade Dress is entirely non-functional. Zimmerman Dec., ¶ 60. The design elements of the XENON Trade Dress are not dictated by the internal water squirting operation of the toys. *Id*. Since 2004, sales of the XENON water squirting toy featuring the XENON Trade Dress total at least 238,000 units, and $1,561,000 in sales. *Id.*, ¶¶ 51, 52.

---

[10]    Amended Verified Complaint (ECF No. 7), Exhibit H.

10

**B.**     **Swimways Infringement of the Avenger Trade Dress and the KWIK GRIP XL Trade Dress**

Swimways appears to be a company focusing on swimming pools and related products, as shown by their website at www.swimways.com.  On February 7, 2014, it came to the attention of Buzz Bee that Swimways was selling knock-off copies of the Buzz Bee's WATER WARRIORS Line that replicate Buzz Bee's WATER WARRIORS Trade Dress in Target stores.  Zimmerman Dec., ¶ 63.  Specimens of Swimways' Infringing Line were purchased from a Target store at that time.  *Id*., ¶¶ 63, 64, 66, 68, 70.

**1.**     **Swimways' Infringing STORM Water Squirting Toy**

Swimways' STORM water squirting toy is shown below:[11]



The price of the Swimways' STORM water squirting toy was $7.99.  Zimmerman Decl., ¶ 64.  Like Buzz Bee's AVENGER water squirting toy, the Swimways'

---

[11]     Zimmerman Decl., Exhibit Q; Amended Verified Complaint (ECF No. 7), Exhibit I.

STORM is packaged so that the product dominates the appearance of the packaging, and is immediately apparent when a consumer views the product for sale.

A comparison of Swimways' STORM water squirting toy and Buzz Bee's AVENGER water squirting toy is shown in <u>Exhibit 9</u> and below[12]:

 

### 2.    Swimways' Infringing STRYKER Water Squirting Toy

Swimways' STRYKER water squirting toys are shown below[13]:



---

[12]    Zimmerman Decl., Exhibit R; Amended Verified Complaint (ECF No. 7), Exhibit J.
[13]    Zimmerman Decl., Exhibit T; Amended Verified Complaint (ECF No. 7), Exhibit K.

The price of the Swimways' STRYKER water squirting toy was $5.99. Zimmerman Decl., ¶ 66.

Comparisons of Swimways' STRYKER water squirting toys and Buzz Bee's KWIK GRIP XL water squirting toys, both packaged and unpackaged, are shown in <u>Exhibit 10</u> and below[14]:







---

[14]    Zimmerman Decl., Exhibit U; Amended Verified Complaint (ECF No. 7), Exhibit L.

13

### 3.    Swimways' Infringing TSUNAMI Water Squirting Toy

Swimways' TSUNAMI water squirting toy is shown below[15]:



The price of the Swimways' TSUNAMI water squirting toy was $9.99. Zimmerman Decl., ¶ 68.

Comparisons of Swimways' TSUNAMI water squirting toy and Buzz Bee's ARGON water squirting toys are shown in <u>Exhibit 11</u> and below[16]:



### 4.    Swimways' Infringing AVALANCHE Water Squirting Toy

Swimways' AVALANCHE water squirting toy is shown below[17]:

---

[15]    Zimmerman Decl., Exhibit V; Amended Verified Complaint (ECF No. 7), Exhibit M.
[16]    Zimmerman Decl., Exhibit W; Amended Verified Complaint (ECF No. 7), Exhibit N.



The price of the Swimways' TSUNAMI water squirting toy was $14.99. Zimmerman Decl., ¶ 70.

Comparisons of Swimways' AVALANCHE water squirting toy and Buzz Bee's XENON water squirting toy are shown in <u>Exhibit 12</u> and below[18]:



### 5.     Summary of Swimways' Infringing Line

Rather than, through fair competition (e.g., research, design and development), or by creating its own line of water squirting toys with an individual appearance, Swimways chose instead to copy Buzz Bee's WATER WARRIORS Line.  Swimways did this as a short-cut to immediately gain entry into Buzz Bee's

---

[17]     Zimmerman Decl., Exhibit X; Amended Verified Complaint (ECF No. 7), Exhibit O.

[18]     Zimmerman Decl., Exhibit Y; Amended Verified Complaint (ECF No. 7), Exhibit P.

15

market, and replace Buzz Bee on Target's store shelves. Down to the smallest minutiae, Swimways' Infringing Line copies the elements of the Buzz Bee's WATER WARRIORS Trade Dress.

It is apparent that whoever created Swimways' Infringing Line had in their possession Buzz Bee's WATER WARRIORS Line, and intentionally copied Buzz Bee's WATER WARRIORS Trade Dress. Zimmerman Decl., ¶¶ 72, 78. Such precise and exact copying could not have been the result of coincidence or an accident. *Id*.

### C.    Target Replaces Buzz Bee's WATER WARRIORS Line with an Identical Knock-Off

Target previously carried the Buzz Bee WATER WARRIORS Line, and did so until 2014. Zimmerman Decl., ¶ 62. In August 2013, Buzz Bee was informed by Target's agent that Target would no longer be carrying Buzz Bee's WATER WARRIORS Line in 2014. *Id*. Buzz Bee was shocked to recently discover that Buzz Bee's WATER WARRIORS Line was replaced on Target's shelves with duplicates of the Buzz Bee's WATER WARRIORS Trade Dress. Manifestly, it was as if Target performed a "global-search-and-replace," with Swimways look-alike Infringing Line replacing Buzz Bee's WATER WARRIORS Line.

2985361-2

**D.      Preliminary Injunctive Relief is Warranted**

Buzz Bee respectfully moves this Court to preliminarily enjoin Swimways and Target from selling Swimways' Infringing Line, as that line of products is a blatant and willful infringement of Buzz Bee's previously established rights, and the continued sale of the Swimways' Infringing Line irreparably harms Buzz Bee.

**II.      LEGAL STANDARDS**

A court may properly issue a preliminary injunction when the following factors weigh in favor of the movant: (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and, (4) the public interest.  *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356 (3d Cir. 2007); *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191-92 (3d Cir. 1990) (citations omitted). A district court should endeavor to "balance[] these four… factors to determine if an injunction should issue." *Am. Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (*en banc*).

"One of the goals of the preliminary injunction analysis is to maintain the *status quo*, defined as the last, peaceable, noncontested status of the parties." Opticians, 920 F.2d at 197 (citation and quotation omitted); see also 5 J. Thomas

17

McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 30:50 (4th ed. 2003) ("The status quo to be preserved is not the situation of contested rights . . . . In a trademark case, [it] is the situation prior to the time the junior user began use of its contested mark: the last peaceable, non-contested status.").

### A.    Trade Dress Infringement under the Lanham Act

The Lanham Act, 15 U.S.C. § 1125(a), establishes a cause of action for trade dress infringement. *McNeil*, 511 F.3d at 357, *citing TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28-29 (2001). "'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Shire US Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 353 (3d Cir. 2003). It is "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000). The purpose of trade dress protection is to "secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Shire US*, 329 F.3d at 353 (internal brackets and citation omitted).

To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are

18

likely to confuse the source of the plaintiff's product with that of the defendant's product.[19] Id.  For the trade dress of product packaging, the trade dress may be considered to be inherently distinctive.  *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 214-15 (2000).  For the trade dress of a product, a plaintiff must show that the trade dress has achieved a secondary meaning or acquired distinctiveness.  *Id.*

A likelihood of confusion exists when consumers viewing the defendant's trade dress probably would assume that the product it represents is associated with the source of a different product identified by the plaintiff's similar trade dress. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000).  A district court should employ the factors announced in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983), to determine whether there is a likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 297 (3d Cir. 2001). These factors, as modified semantically in the trade dress context, are:

> (1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress; (2) the strength of the plaintiff's trade dress; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

---

[19]    The elements necessary for proving common law unfair competition, violations of the New Jersey Counterfeiting Statute (N.J.S.A. § 56:3-13.16), and Unfair Competition Statute (N.J.S.A. § 56:4-1), are similar to the Lanham Act claims.  *See, e.g., Coach, Inc. v. Fashion Paradise, LLC*, Civil No. 10-4888 (JBS/KMW), 2012 U.S. Dist. LEXIS 7429, at *13 (D.N.J. Jan. 20, 2012).

(4) the length of time the defendant has used its trade dress without evidence of actual confusion arising; (5) the intent of the defendant in adopting its trade dress; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and, (10) other facts suggesting that the consuming public might expect the plain-tiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

*Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005).

"[T]he *Lapp* test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting." *Id*. (internal citation omitted).

All of the factors considered in granting preliminary injunctive relief strongly favor Buzz Bee, and the Court should immediately enjoin Swimways' and Targets use and/or sale of Swimways' Infringing Line, and any other goods having a trade dress similar to the Buzz Bee's WATER WARRIORS Trade Dress.

## III.   LEGAL ARGUMENT

### A.   Buzz Bee Will Likely Succeed On The Merits In Demonstrating Trade Dress Infringement

This is a case where the Swimways has intentionally and precisely copied Buzz Bee's WATER WARRIORS Trade Dress, for use with identical goods.  As demonstrated herein, there is a high likelihood that Buzz Bee will succeed on the merits of its trade dress infringement claims.

1.    **Buzz Bee's WATER WARRIORS Trade Dress Is Both Inherently Distinctive and Has Achieved a Strong Secondary Meaning**

As shown by Zimmerman Dec. Exhibits A, E, I and M (and shown herein), Buzz Bee's WATER WARRIORS Line is packaged in such a way that the products themselves are integral parts of, and are in effect, the packaging displays. A consumer viewing the products on display for sale will perceive the products as part of the packaging.

"Since the choices that a producer has for packaging its products are… almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive, and the only real question for the courts will be whether there is a likelihood of confusion between the products,… provided, of course, the trade dress is not functional." *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993).  An inherently distinctive trade dress is one that almost automatically tells a consumer that it refers to a brand or a source for a product, such that consumers will be predisposed to equate the trade dress with the source of a product. *Wal-Mart*, 529 U.S. at 211-12.

The packaging and display of Buzz Bee's WATER WARRIORS Line is unique in the relevant field, and therefore inherently distinctive.  Zimmerman Dec., ¶¶ 19, 32, 45, 58.  The packaging has a distinctive look that intrinsically serves to differentiate Buzz Bee's WATER WARRIORS Line when they are on display to a

consumer. *Id.* In addition, there are virtually unlimited design choices to competitors, who can readily product a water squirting toy, without copying Buzz Bee's WATER WARRIORS Line or Buzz Bee's WATER WARRIORS Trade Dress. *Id.*, ¶¶ 20, 33, 46, 59.

The appearances of the products themselves have also acquired secondary meaning. Trade dress acquires secondary meaning when the consuming public associates it with the source of the particular product rather than the product itself. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n.11 (1982); *CPC Int'l, Inc. v. Caribe Food Distributors*, 731 F. Supp. 660, 666 (D.N.J. 1990). Stated another way, "[a] plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source."[20] *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (citation omitted). A non-exhaustive list of factors that courts consider in determining the existence of secondary meaning are: (1) length and exclusivity of use; (2) buyer association of the mark with its source; (3) sales success; (4) extent of advertising; and (5) the fact of copying. *Ideal Toy Corp. v. Plawner Toy Mfg. Co.*, 685 F.2d 78, 82 (3d Cir. 1982); *Locatelli, Inc. v. Tomaiuoli*, 129 F. Supp. 630, 634 (D.N.J. 1955).

---

[20]    Consumers do not need to be able to identify the single source. *Kampgrounds of America, Inc. v. North Delaware A-OK Campground, Inc.*, 415 F. Supp. 1288, 1293 (D. Del. 1976), *aff'd without op.*, 556 F.2d 566 (3d Cir. 1977) ("The significance of secondary meaning is not that the consumers know the identity of the provider of services, but rather that they regard all services labeled with the mark as originating from a single source.").

The AVENGER Trade Dress has been in use exclusively since at least 2007. Zimmerman Dec., ¶ 11.  The KWIK GRIP XL Trade Dress has been in use exclusively since at least 2003.  *Id*., ¶ 24.  These time periods are longer than those that have been accepted as establishing secondary meaning in trade dress cases. *Secular Orgs. for Sobriety, Inc., v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir. 2000) (*prima facie* evidence of the development of secondary meaning is established where a mark has been continuously and exclusively used for a period of five years); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) ("five years' use is a strong factor in favor of secondary meaning"); In addition, the Trademark Office accepts five (5) years of exclusive use as *prima facie* evidence of trade dress secondary meaning. See 15 U.S.C. § 1052(f).  The ARGON Trade Dress and the XENON Trade Dress were used in commerce for nearly as long, at least four (4) years, and can still be seen today on the internet.  Zimmerman Decl., ¶¶ 37, 41, 50, 54.

Both the AVENGER Trade Dress and the KWIK GRIP XL Trade Dress are widely featured at retail stores and over the internet, including on websites that are toy shooter "fan" sites dedicating pages to Buzz Bee's water squirting toys. Zimmerman Dec., ¶¶ 15-16, 28-29. The ARGON Trade Dress and XENON Trade Dress were previously available through the same channels of trade, and can still be found on the internet.  *Id*., ¶¶ 40, 41, 53, 54.  This results in numerous consumer

impressions as parties search the internet. *Id.*, ¶¶ 15, 28, 41, 54.  It is likely that millions of consumers search the internet each day, visiting websites such as Amazon, WalMart, and Sears, where Buzz Bee's WATER WARRIORS Line are sold or displayed.  Third party advertising of the trade dress at issue supports a finding of secondary meaning.  See *Blumenthal Distrib. v. Exec. Chair, Inc.*, CV-10-1280 (CBA), 2010 U.S. Dist. LEXIS 142193, at *24 (E.D.N.Y. Nov. 9, 2010) ("…the depiction of Blumenthal's chairs on third-party web sites has undoubtedly contributed to the public's association of those chairs with a single source.") (citation omitted).

To date, sales of the Buzz Bee's WATER WARRIORS Line are as follows (Zimmerman Decl., ¶¶ 12-13, 25-26, 38-39, 51-52):

| Trade Dress | Unit Sales | Dollar Sales |
|---|---|---|
| AVENGER Trade Dress | 102,684 | $  206,352 |
| KWIK GRIP XL Trade Dress | 2,033,223 | $4,197,858 |
| ARGON Trade Dress | 368,000 | $1,584,000 |
| XENOX Trade Dress | 238,000 | $1,561,000 |

These figures are quite substantial for products selling at retail for between $2.49 and $14.99 dollars.  Zimmerman Decl., ¶¶ 17, 30, 43, 56.  Unit sales similar to these have been found to support a finding of secondary meaning in trade dress cases.  *See Wolf Appliance, Inc. v. Viking Range Corp.*, 686 F. Supp. 2d 878, 884 (W.D. Wis. 2010) (325,000 units over 10 years); *Blumenthal Distrib.*, 2010 U.S. Dist. LEXIS 142193, at *25 (250,000 units in six years).

24

Evidence of intentional copying also strongly supports an inference of secondary meaning.[21] *Vision Sports*, 888 F.2d at 615.  As stated above, and as shown by the precision in copying, Swimways has *intentionally* copied the Buzz Bee's WATER WARRIORS Trade Dress, to trade on established goodwill.  There can be no other plausible explanation for the exactitude with which Swimways copied Buzz Bee's trade dress down to the smallest feature.  *See*, *e.g.*, *Carolina Enterprises v. Coleco Indus.*, No. 81-214, 1981 U.S. Dist. LEXIS 15824, at *20 (D.N.J. Mar. 2, 1981) ("[The rule regarding copying demonstrating secondary meaning] is based on the theory that one only copies something of value and would not copy the trade dress of a product if it does not afford some commercial gain.").

Considering the foregoing factors, it is clear that the Buzz Bee's WATER WARRIORS Trade Dress has achieved a strong secondary meaning within the relevant toy industry, and comprises a protectable trade dress.

---

[21]   This Court has previously held that "copying alone is sufficient to establish secondary meaning in a trade dress case." *Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F. Supp. 787, 792-793 (D.N.J. 1988); *Carolina Enterprises v. Coleco Indus.*, No. 81-214, 1981 U.S. Dist. LEXIS 15824, at *20 (D.N.J. Mar. 2, 1981).  More recent cases have stated that intentional copying is only one of many considerations in the [multi]-factor test and does not *alone* establish secondary meaning. *Good 'N Natural v. Nature's Bounty, Inc.*, Civ. A. No. 87-662, 1990 U.S. Dist. LEXIS 11414, 1990 WL 127126, at *12 (D.N.J. Aug. 30, 1990).

### 2.    Buzz Bee's WATER WARRIORS Trade Dress Is Non-Functional

In general terms, a product feature is functional, and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (U.S. 1995), *quoting Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 851 n. 10 (1982); *Ideal Toy*, 685 F.2d at 81.  The functionality inquiry must focus on the total overall look of the trade dress. *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 153 (3d Cir. 1984).

The designs in Plaintiff's products and packaging are neither "essential to the use or purpose of" the products nor "affect the [products'] cost or quality." *Traffix Devices*, 532 U.S. at 32.  The toys are water squiring toys, and the operational function of the toys is to squirt water.  All of the water squirting "machinery" is internal.  Zimmerman Dec., ¶¶ 21, 34, 47, 60.  The outer appearance of the toys is not dictated by the function.  The "space-age" look of Buzz Bee's WATER WARRIORS Trade Dress is ornamental.  Buzz Bee's WATER WARRIORS Trade Dress serves no purpose other than identification.  *See Ideal Toy*, 685 F.2d at 81.

### 3. There Is A Likelihood Of Confusion Between Buzz Bee's WATER WARRIORS Trade Dress And Swimways' Infringing Trade Dress

Under Lanham Act § 43(a), "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the [trade dress]… Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical -- is there a 'likelihood of confusion?'"[22] *Two Pesos*, 505 U.S. at 780 (citation omitted). To trigger liability under the Lanham Act, the infringer's trade dress and the owner's trade dress need only be confusingly similar; they need not be identical. *Fisons Horticulture, Inc. v. Vigoro Indus, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Proof of actual confusion is not necessary. *Ford Motor Co.*, 930 F.2d at 292 (citations omitted).

Given the closeness in trade dress appearance and the fact that the goods are identical, Buzz Bee respectfully submits that an extended analysis of the "likelihood of confusion" issue is unnecessary. Long-standing and recently reiterated precedent of this Circuit compels a finding of likelihood of confusion

---

[22]    The Third Circuit has explained the "likelihood of confusion" as existing "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons*, 30 F.3d at 472, *quoting Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (internal quotations omitted).

based on the consideration of the trade dress alone. *See Fisons*, 30 F.3d at 477, and cases cited therein; *A & H Sportswear*, 166 F.3d at 202:

> The ten-factor test for likelihood of confusion between marks that are not competing, derived from *Scott Paper Co*, 589 F.2d at 1229, is not required when the goods directly compete. In fact, we have said that "where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983).

Buzz Bee submits that a likelihood of confusion exists due to the identity in appearance of Buzz Bee's WATER WARRIORS Trade Dress, and Swimways' Infringing Line. Nonetheless, the following analysis of the Lapp factors which the Third Circuit held should be considered in determining likelihood of confusion demonstrates that Buzz Bee will likely succeed in establishing trade dress infringement.

### a. The Trade Dress at Issue is Legally Identical (Lapp Factor #1)

"The single most important factor in determining likelihood of confusion is mark similarity." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010), *quoting A & H Sportswear*, 237 F.3d at 216. Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477. The proper test is not a side-by-side comparison but, rather, whether the marks create the same overall impression when viewed separately.

28

*Sabinsa*, 609 F.3d at 183-184, *citing Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004). Overall impression is created by the sight, sound, and meaning of the mark. *Sabinsa*, 609 F.3d at 183-184, *citing A & H Sportswear*, 237 F.3d at 217.

"The degree of similarity… needed to prove likely confusion will vary with the difference in the goods… Where the goods… are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Sabinsa*, 609 F.3d at 183, *citing Kos*, 369 F.3d at 713 (<u>quoting</u> MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:20.1 (4th ed. 2003)).

Generally, if the overall impression created by marks is essentially the same, "it is very probable that the marks are confusingly similar." *Opticians*, 920 F.2d at 195, <u>quoting</u> 2 MCCARTHY, § 23:7. Where the owner of the trademark and the infringer "deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark… and compare it against the challenged mark." *Opticians*, 920 F.2d at 195, <u>quoting</u> *Lapp*, 721 F.2d at 462. Proof of actual confusion is not necessary; likelihood is all that need be shown. *Id.* (citation omitted).

Courts have held "'[i]f the overall impression created by the [trade dress] is essentially the same, 'it is very probable that the marks are confusingly similar.'"'

29

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 281 (3d Cir. 2001) (*quoting Opticians*, 920 F.2d at 195). Therefore, "[i]n comparing the degree to which trade dresses are similar,… the test to be applied is whether after looking at the visual similarity of the [trade dress] when viewed as a whole, and not by attention to individual features, one is left with the impression that a consumer would not be able to distinguish a defendant's product from a plaintiff's product if he or she saw the latter alone." *Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F. Supp. 787, 793-94 (D.N.J. 1988) (citation omitted).  The proper inquiry is whether the two trade dresses create the same overall impression when separately viewed. *McNeil Nutritionals*, 511 F.3d at 359.

    Clearly, the first *Lapp* Factor strongly favors Buzz Bee, and this Court would be justified in finding a likelihood of confusion and ending the inquiry here. *Opticians*, 920 F.2d at 195; *A & H Sportswear*, 166 F.3d at 202.  As shown by Zimmerman Dec. Exhibits S, U, W and Y, and Amended Verified Complaint (ECF No. 7) Exhibits J, L, N and P, Swimways' Infringing Line comprises essentially identical knock-offs of Buzz Bee's WATER WARRIORS Trade Dress.  This Court has enjoined infringing trade dress in similar circumstances.  *See*, *e.g.*, *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, No. 81-1431, 1981 U.S. Dist. LEXIS 17757, at **9-12 (D.N.J. Oct. 20, 1981), *aff'd as modified*, Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78 (3d Cir. 1982).

30

Moreover, there has also been at least one instance of actual confusion, which is not surprising considering the precise copying.  A third party website following toy water shooters assumed that Swimways' STRYKER toys were "reshells" of Buzz Bee's KWIK GRIP XL toys.  Zimmerman Dec., ¶ 73, Exhibit Z. This evidence of actual confusion is potent evidence of the likelihood of confusion. *Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc.*, 94 F. Supp. 2d 566, 584 (E.D. Pa. 1999).

### b.     Buzz Bee's WATER WARRIORS Trade Dress Is Strong (<u>Lapp</u> Factor #2)

Courts have acknowledged that the strength of trade dress is dependent upon the product's "commercial context," and they look to the "'tendency [of the trade dress] to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer.'" *Fun-Damental Too v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997) (citation omitted).

Buzz Bee's WATER WARRIORS Line has enjoyed significant commercial success since their inception, a factor weighing in favor of finding that the trade dress is commercially strong.  Zimmerman Dec., ¶¶ 12-13, 25-26, 38-39, 51-52. Moreover, Buzz Bee's WATER WARRIORS Trade Dress is unique to Buzz Bee, and not used by third parties (other than Swimways).  *Id*., ¶¶ 19, 32, 45, 58.

     **c.**    **The Goods Are Identical, Inexpensive, Targeted To a Young Class of Consumers, and Sold to Similar Consumers Through Similar Channels of Trade (<u>Lapp</u> Factors #3, #7, #8 and #9)**

These *Lapp* Factors assess the goods, the consumers purchasing the goods, and how the goods are sold.

Considering *Lapp* factor #9 first, "The closer the relationship between the products… the greater the likelihood of confusion." *Kos*, 369 F.3d at 722-723, *quoting Lapp*, 721 F.2d at 462. The question is how similar, or closely related, the products are. *Kos*, 369 F.3d at 722-723, *citing Fisons*, 30 F.3d at 481. Here, the goods are all water squirting toys.

Considering <u>Lapp</u> Factor #3, the focus on the "price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *Lapp*, 721 F.2d at 463. "Inexpensive goods require consumers to exercise less care in their selection than expensive ones." *Versa Prods. Co. v. Bifold Co. (Mfg).*, 50 F.3d 189, 204 (3d Cir. 1995). Therefore, for inexpensive goods, the potential for confusion is heightened. *Id*.; *Katiroll Co. v. Kati Roll & Platters, Inc.*, Civil Action No. 10-3620 (GEB), 2011 U.S. Dist. LEXIS 9571, at *29 (D.N.J. Feb. 1, 2011). Buzz Bee's products at issue sell for between $2.49 and $14.99. Zimmerman Dec., ¶¶ 17, 30, 43, 56. The goods offered under Swimways' Infringing Trade Dress were purchased for between $5.99 and $14.99. *Id*., ¶¶ 36, 39, 68, 70. In addition to the prices indicating a low degree of consumer care, the

parties target customers are children ages 4-12. *Id.*, ¶¶ 75-76. It is unlikely that such children exercise a high degree of care when buying toys themselves, or asking parents to purchase water squirting toys for them. *Id.*

The level of care and attention in purchasing the goods is low, and the likelihood of confusion is therefore high. *Sabinsa*, 609 F.3d at 186; *see also* Zimmerman Dec., ¶¶ 44-50. Thus, *Lapp* Factors #7 and #8 are satisfied. *Sabinsa*, 609 F.3d at 189. These factors all weigh in favor of granting the requested relief.

### d. Swimways Intentionally Copied the AVENGER Trade Dress and KWIK GRIP XL Trade Dress

"Evidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding [a] likelihood of confusion." *Kos*, 369 F.3d at 721, *quoting Checkpoint*, 269 F.3d at 286. This inquiry extends beyond asking whether a defendant purposely chose its mark to "promote confusion and appropriate the prior user's good will." *Kos*, 369 F.3d at 721, *quoting Fisons*, 30 F.3d at 479 (quotation omitted). "It is so easy for a business man who wishes to sell his goods upon their merits to select marks and packagings that cannot possibly be confused with his competitor's that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *Florence Manufacturing Co. v. J. C. Dowd & Co.*, 178 F. 73, 75 (2d Cir. 1910).

33

As Professor McCarthy's treatise, McCarthy on Trademarks and Unfair Competition § 8:19 (4th Ed. 1996), notes, "close similarity of trade dress in a plethora of detail raises a serious question of copying and intent to confuse customers. In such a situation, all heads turn to the defendant to hear some explanation."  Moreover, evidence of intent to copy is circumstantial evidence of likelihood of confusion. *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F. Supp. 338, 347 (E.D. Pa. 1988) (citation omitted).

The evidence of intentional infringement in this case is manifest.  The intent factor in this case weighs heavily in favor of Buzz Bee.

### B.    Immediate Injunctive Relief is Warranted in this Case

#### 1.    Plaintiff Will Suffer Irreparable Injury

Without question, Buzz Bee will prevail at trial.  In the meantime, Buzz Bee faces the serious prospect of irreparable injury to its valuable trade dress rights, including damage to its reputation and goodwill.  Zimmerman Dec., ¶¶ 74-82.  Buzz Bee cannot control the quality of Swimways goods sold under the infringing trade dress, which could readily be confused with Buzz Bee's.  *Id.*; *see International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) ("[T]he most corrosive and irreparable harm attributable to a trademark infringement is the inability of the victim to control the nature and the quality of [the infringer's] goods.").  Allowing Swimways to offer products having the

identical trade dress as Buzz Bee's products obviates years of effort, promotion and marketing. *Id.* It is not likely that Buzz Bee could recover the goodwill lost due to Swimways' infringement. Counterfeiting and knock-offs are particularly problematic in the toy industry, and allowing Swimways to gain a foothold in Buzz Bee's market by simply copying Buzz Bee's WATER WARRIORS Trade Dress decreases the salability of Buzz Bee's WATER WARRIORS Line. *Id.*, ¶ 82.

The Third Circuit has held that once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury. *Opticians*, 920 F.2d at 196-97 (citations omitted). Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992); *citing Opticians*, 920 F.2d at 195. Lack of control amounts to irreparable injury regardless of allegations that the infringer is putting the mark to better use. *Id.* at 195-96 (collecting citations). Finally, and most importantly for this case, trademark infringement amounts to irreparable injury as a matter of law. *S & R Corp.*, 968 F.2d 371 at 378, *citing Opticians*, 920 F.2d at 195 (*citing International Kennel Club*, 846 F.2d at 1092 (damages "caused by trademark infringement are by their very nature irreparable")).

Swimways has placed itself in a position to pass Swimways' goods off as those of Buzz Bee's, and has purposefully done so. This is the precise injury

35

preliminary injunctive relief was designed to curtail.  Id.  It is well-established that injury arising out of trademark infringement and public confusion cannot be accurately measured or accurately compensated in money damages.  *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F. Supp. 1003, 1019 (E.D. Pa. 1976); *Franklin Mint, Inc. v. Franklin Mint, Ltd.*, 331 F. Supp. 827, 830 (E.D. Pa. 1971).  Buzz Bee is irreparably injured by Swimways' trade dress infringement.

### 3.    The Balance of Hardships Favors Immediate Injunctive Relief

The hardship Buzz Bee must endure from having its reputation and good will in the hands of an infringer far outweighs any potential claim of hardship to Swimways or Target.  *Opticians*, 920 F.2d at 197.  Buzz Bee has acted diligently and in good faith to protect its rights.  Zimmerman Dec., ¶ 83.  By doing so, Buzz Bee has minimized any conceivable damage to Defendant due to the grant of an injunction.

All that Buzz Bee requests at this time is that the infringement of its trade dress stops, and the goods are removed from Target's store shelves.  Realistically, this means that Swimways and Target must cease offering goods that do not even appear on the Swimways website.  This cannot be a particularly difficult or expensive task for Swimways.  At any rate, having adopted an infringing course of conduct, Swimways cannot now complain it must mend its ways.  *Opticians*, 920 F.2d at 197; *Lesportsac, Inc. v. K-Mart Corp.*, 607 F. Supp. 183, 187 (E.D.N.Y.

36

1984), *aff'd*, 754 F.2d 71 (2d Cir. 1985) ("Defendant has brought these hardships on itself.  It is the duty of the newcomer to identify its product in a manner that will avoid a likelihood of confusion with the product of the first comer."); *see also Pappan Enter, v. Hardee's FoodSys., Inc.*, 143 F.3d 800 (3d Cir. 1998).  A grant of the injunction will not put Swimways out of business but rather, "will keep [defendant] within the law in the conduct of their business."[23]  *Perry Knitting Co. v. Meyers*, 120 F. Supp. 880, 885 (S.D.N.Y. 1954).  The equities, therefore, overwhelmingly favor Buzz Bee.

### 4.    The Public Interest Favors Immediate Injunctive Relief

The final prong in the preliminary injunction analysis is a consideration of the public interest.  The Third Circuit has held that "[i]n a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.'" *S & R Corp.*, 968 F.2d at 379 (*quoting Opticians*, 920 F.2d at 197).

The trademark laws insure protection of third party purchasers as well as the mark's owner.  *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985).  The public interest in the enforcement in the trademark laws will be advanced by the issuance of injunctive relief.  *Opticians*, 920 F.2d at 198.  The public is entitled to rely on valid marks as identifying the products it has come to

---

[23]    For these reasons, BBT believes that a bond of no more than $1,000 is appropriate in this case.

associate with that mark.  *Id*.  Not only is the owner of the mark entitled to preventing another passing off offending goods as those of the owner, but also the public is entitled to be free of confusion or deceit from improperly appropriated marks.  *Id*.  Because the purchasing public has the right to be free from confusion and deception, *Opticians*, 920 F.2d at 197-98, and because the public interest is advanced by preventing erosion of property interests in trademarks, *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984), this Court should preliminarily enjoin Swimways' trade dress infringement and unfair competition.

## IV.    CONCLUSION

In view of the foregoing, it is respectfully submitted that all sales, promotion and advertising of Swimways' infringing trade dress should be preliminarily enjoined.  A proposed order accompanies this Motion.

Respectfully submitted,

Dated: April 11, 2014                    By:   *s/Michael F. Snyder*
                                              Michael F. Snyder, Esquire
                                              John J. Sullivan, Esquire
                                              VOLPE AND KOENIG, P.C.
                                              United Plaza, 30 S. 17th St.
                                              Philadelphia, Pa 19103
                                              Tele: 215-568-6400
                                              Fax: 215-568-6499

                                              *Attorneys for Plaintiff,*
                                              *Buzz Bee Toys, Inc.*