## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BUZZ BEE TOYS, INC., | ) | CIVIL ACTION NO. |
| | ) | |
| Plaintiff, | ) | 1:14-cv-01948-JBS-KMW |
| | ) | |
| v. | ) | Hon. Jerome B. Simandle, U.S.D.J. |
| | ) | |
| SWIMWAYS CORPORATION | ) | Hon. Karen M. Williams, U.S.M.J. |
| and | ) | |
| TARGET CORPORATION, | ) | Hearing date: May 19, 2014 at 10a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

**Joel Max Eads, Esq.**
**Katharine J. Thompson, Esq.**
**Trenk, DiPasquale, Della Fera & Sodono, P.C.**
**347 Mt. Pleasant Avenue**
**West Orange, New Jersey 07052**

Craig L. Mytelka, Esq. (pro hac vice pending)
Martin W. Hayes, Esq. (pro hac vice pending)
WILLIAMS MULLEN, P.C.
222 Central Park Avenue, Suite 1700
Virginia Beach, VA 23462
Telephone: (757) 499-8800
Facsimile: (757) 473-0395

*Attorneys for Defendants*

## **Table of Contents**

I.  PRELIMINARY STATEMENT ........................................................................1

II.  FACTUAL BACKGROUND........................................................................3

    a.  SwimWays and the Creation of the Flood Force Water Squirting Toys .........3

    b.  Buzz Bee's Water Warriors Line ............................................................4

    c.  SwimWays' Flood Force Line..................................................................5

    d.  Third Party Water Squirting Toys .........................................................8

III.  LEGAL STANDARDS ............................................................................8

    a.  Preliminary Injunction...........................................................................8

    b.  Trade Dress Rights in Product Design ...................................................9

IV.  LEGAL ARGUMENT .............................................................................12

    a.  Buzz Bee has Not Shown a Likelihood of Success on the Merits ................12

       i.   Buzz Bee's Alleged Trade Dress is Invalid because it Attempts to Bar
Others from Using Non-Source Identifying Features ......................................12

       ii.  Buzz Bee Has Failed to Show a Likelihood of Confusion .........................21

    b.  Buzz Bee has Not Shown That It Would Suffer Immediate Irreparable Injury
if an Injunction Is Not Granted....................................................................28

    c.  SwimWays Will Suffer Irreparable Harm If the Injunction Is Issued ..........32

    d.  The Equities and Public Interest Favor SwimWays.......................................33

V.  CONCLUSION.........................................................................................33

## <u>Table of Authorities</u>

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000) ...........................................................................................................11

*Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555 (W.D. Pa. 2013) ................................................................................................. 30, 33

*Am. Civil Liberties Union of N.J. v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471 (3d Cir. 1996) (*en banc*) ..................................................9

*AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir. 1994)..........9

*Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) ........................................30

*Aurora World, Inc. v. Ty, Inc.*, 719 F. Supp. 2d. 1115 (C.D. Cal. 2009) ...............31

*Blumenthal Distrib. V. Exec. Chair, Inc.*, 2010 U.S. Dist. LEXIS 142193 (E.D.N.Y. 2010)...........................................................................................20

*Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304 (2d Cir.1972)....................22

*Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431 (3d Cir. 1994) ................................................................................................ 16, 19, 23

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ....................... 28, 29

*Euro Pro Corp. v. Tristar Products, Inc.*, 172 F.Supp.2d 567 (D.N.J. 2001) .........16

*Ferring Pharms. Inc. v. Watson Pharms, Inc.*, No. 12-cv-05824, 2013 WL 1405226 (D.N.J. April 4, 2013)....................................................................29

*Ferring Pharms. Inc. v. Watson Pharms, Inc.*, No. 13-2290 (3rd Cir. argued Feb. 12, 2014) ....................................................................................................30

*Gen. Motors Corp. v. Lanard Toys, Inc.,* 468 F.3d 405 (6th Cir. 2006) ................20

*Genovese Drug Stores, Inc. v. TGC Stores*, 939 F. Supp. 340 (D.N.J. 1996).........32

*Good'N Natural v. Nature's Bounty, Inc.*, 1990 WL 127126 (D.N.J. 1990) ...........20

*Herb Reed Enterprises, LLC v. Florida Entertainment Opinion Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013) ......................................................................30

*Ideal Toy Corp. v. Pawner Toy Mfg. Corp.*, 658 F.2d 78 (3d Cir. 1982).................5

*Ill. Tool Works, Inc. v. Grip--Pak, Inc.*, 906 F.2d 679 (Fed. Cir. 1990).................32

*In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985) ...............18

*In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1 (Fed. Cir. 1984) ...................18

*In re Udor USA Inc.*, 89 U.S.P.Q.2d 1978, 1985 (T.T.A.B. 2009) ........................14

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir.1983)....................................11

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819 (9th Cir.1993) ...............33

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)...................................10

*King Pharm. Inc. v. Sandoz, Inc.*, No. 08–5974, 2010 WL 1957640, at *5 (D.N.J. May 17, 2010)................................................................................................29

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)..............28

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350 (3d Cir. 2007) ........................................................................................................9, 26

*Merch. & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.*, 963 F.2d 628 (3d Cir. 1992) ...........................................................................................................15

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228–29 (11th Cir. 2008) ...........................................................................................................30

*Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187 (3d Cir.1990)..........................................................................................................9

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800 (3d Cir.1998)......28

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (U.S. 1995)............................10

*Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) .................................................30

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978)..... 11, 12

*Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902 (9th Cir.1995) ........................................................................... 17, 18

*Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348 (3d Cir. 2003)................................9

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 121 S. Ct. 1255 (U.S. 2001) .......2, 10

*Tyco Indus., Inc. v. Tiny Love, Ltd.*, 914 F. Supp. 1068 (D.N.J. 1996)...................16

*Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189 (3d Cir. 1995)2, 20, 21, 22, 23, 24, 26, 27

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000).....................2, 10

*Warner-Lambert Co. v. McCrory's Corp.*, 12 U.S.P.Q.2d 1884 (D.N.J. 1989)......31

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) .................... 28, 30

*Wolf Appliance, Inc. v. Viking Range Corp.*, 686 F. Supp. 2d 878 (W.D. Wis. 2010) ...............................................................................................................19

**Statutes**

15 U.S.C. § 1052(f) (2014) .....................................................................................17

15 U.S.C. § 1116(a) (2014).....................................................................................29

15 U.S.C. § 1125(a)(3) (2014) ...............................................................................10

15 U.S.C. § 1127 (2014) .........................................................................................18

35 U.S.C. § 283 (2014) ...........................................................................................29

N.J. Stat. Ann. 56:3-13.1a (2014) ..........................................................................18

**Regulations**

15 C.F.R. § 1150.2 (2014) ......................................................................................13

15 C.F.R. § 1150.3 (2014) .........................................................................13

**Other Authorities**

Trademark Manual of Examining Procedure (TMEP) §1212.05(a)........................18

I.    **PRELIMINARY STATEMENT**

Defendants SwimWays Corporation ("SwimWays") and Target Corporation ("Target"), by counsel, submit this Brief in Opposition to Plaintiff Buzz Bee Toys, Inc.'s ("Buzz Bee" or "Plaintiff") Motion for Preliminary Injunctive Relief.

Buzz Bee's allegations that the Defendants conspired to conduct a "global-search-and-replace" of Buzz Bee products from Target's shelves are completely false. While Buzz Bee would like the Court to believe that SwimWays walked into a Target store, bought all four Buzz Bee toys at issue in this suit off the shelves, and slavishly copied those designs, the facts show that this is simply incorrect. Instead, SwimWays picked generic gun designs from a manufacturer's catalog according to Target's configuration requests, made changes to those models without reference to the Buzz Bee toys, fairly competed with Buzz Bee at Target's line review, and succeeded in obtaining a contract with Target to sell its entry-level water squirting toys. Furthermore, for at least two years prior to this suit, Target sold only <u>one</u> of the Water Warriors toys at issue in this suit. Thus, the alleged "global-search-and-replace" of Buzz Bee toys is simply incorrect.

As to Buzz Bee's legal arguments, Buzz Bee's trade dress claims are wholly without merit.[1] First, Buzz Bee has failed to prove that it has any protectable

_____

[1] Buzz Bee's Memorandum of Law in Support of its Motion for Preliminary Injunctive Relief does not reference Counts V through VII or Count XII relating to the tortious interference and unjust enrichment causes of action against

interests in the alleged trade dress.[2]  Specifically, many aspects of Buzz Bee's alleged trade dress are functional and various competitors regularly use similar triggers, grips, handles, water reservoirs, and federally-mandated orange muzzles, among others.  Further, Buzz Bee has failed to come forward with any credible evidence of the alleged source significance of its product designs or that its water squirting toy designs have acquired secondary meaning among consumers.

Second, Buzz Bee has applied the wrong standard for likelihood of confusion for product design trade dress and completely ignores binding Third Circuit precedent on this issue.  By bringing this suit, Buzz Bee is attempting to challenge SwimWays' completely legal and fair competition in the marketplace through sales of product designs that are similar to Buzz Bee's designs, but are marketed under wholly different brands using vastly different labeling, packaging, and marketing materials.  Thus, confusion is highly unlikely between the party's respective water squirting toys.

---

SwimWays.  Therefore, Defendants do not reference the merits of those theories here.

[2] "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 121 S. Ct. 1255, 1560 (U.S. 2001).  "Competitors have broad rights to copy successful product designs when those designs are not protected" by patents and such use is only unfair if it deceives consumers as to the source of the products.  *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 207 (3d Cir. 1995).  Further, courts have routinely noted that product design "almost invariably serves purposes other than source identification."  *See, e.g., Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000).

For these reasons, and as explained in detail below, Buzz Bee falls short of carrying its heavy burden of proving a likelihood of success on the merits and the Court should therefore deny Buzz Bee's motion for preliminary injunctive relief.

II.    **FACTUAL BACKGROUND**

   a. _**SwimWays and the Creation of the Flood Force Water Squirting Toys**_

SwimWays is a worldwide manufacturer of innovative and commercially successful leisure and recreational water products.  Balam Decl. ¶ 3.  The SwimWays brand has been around for over 35 years, and SwimWays continues to invest substantial resources into its product design and development to create unique, quality products which are leaders in the industry.  _Id._ ¶ 4.

In March 2013, SwimWays met with Target to discuss the upcoming sales season and possible opportunities for expanding its product offerings in Target stores.  _Id._ ¶ 5.  A buyer with Target suggested several categories of toy products as potential areas where Target would be willing to discuss changes in its product offerings.  _Id._ ¶ 6.  SwimWays investigated offering a water squirting toy product line because such toys were closely aligned with its product offerings.  _Id._ ¶ 7.

SwimWays approached several manufacturers and reviewed various catalogs to determine what water squirting toys would sell at appropriate price points to fulfill Target's needs.  _Id._ ¶ 8.  SwimWays picked ten models from the manufacturer's catalog and requested that the manufacturer make prototypes.  _Id._

¶ 9.  SwimWays believed each design was a generic water squirting toy design. *Id.*

SwimWays presented its prototypes to Target around May 2013.  *Id.* ¶ 10. SwimWays later made various changes to the prototypes, without reference to the Buzz Bee Water Warriors toys, and presented the modified toys to Target at a line review.  *Id.* ¶ 11.  Various manufacturers, including Buzz Bee and two others, were present at this line review.  *Id.*  SwimWays understood that Target was looking to consolidate vendors in the entry level water guns area, but that it wanted SwimWays to offer a toy line that was exclusive to Target.  *Id.* ¶ 12. SwimWays agreed to offer its Flood Force line exclusively through Target stores. *Id.*  After the conclusion of the line review, Target informed SwimWays that it planned to sell SwimWays proposed toys for the upcoming season.  *Id.* ¶ 13.

### b. ***Buzz Bee's Water Warriors Line***

Buzz Bee's WATER WARRIORS line of water squirting toys ("Water Warriors Product Line") is not currently sold in Target stores.  *Id.* ¶ 28.  Target has not sold Buzz Bee's AVENGER water squirting toys for at least the past two years, and has not sold the XENON and ARGON toys since at least 2009.  *Id.*  Target sold Buzz Bee's KWIK GRIP XL toys through the 2013 season.  *Id.*

### c. *SwimWays' Flood Force Line*

SwimWays recently began selling its line of water squirting toys under the FLOOD FORCE brand, which includes, among others, its AVALANCHE, TSUNAMI, STORM, and STRYKER water squirting toys at issue in this case (collectively the "Flood Force Line"). *Id.* ¶ 14. Each water squirting toy in the Flood Force Line is sold in unique packaging bearing the SWIMWAYS and FLOOD FORCE marks. *See id.* ¶ 19 and Exs. A-D. Each SwimWays toy prominently bears the SwimWays logo embossed on the body of the toys. *See id.* Exs. A-D. A comparison of each toy in the Flood Force Line as packaged with each Water Warriors water squirting toy as packaged is shown in Balam Decl. Exs. A-D and below:[3]

---

[3] Buzz Bee claims its alleged trade dress includes its packaging. However, the only allegation as to packaging states that it allows consumers to see the toy being purchased. *See* Pl. Br. 21; Zimmerman Dec., ¶¶ 19, 32, 45, 58. Buzz Bee does not allege that the consumers are likely to confuse the Buzz Bee and SwimWays packaging, nor does Buzz Bee specifically articulate the allegedly protectable elements of its packaging. *See Ideal Toy Corp. v. Pawner Toy Mfg. Corp.*, 658 F.2d 78 (3d Cir. 1982). Therefore, Buzz Bee fails to state a claim for product packaging trade dress infringement and Defendants decline to address this potential theory in detail in this brief.

### Water Warriors KWIK GRIP XL and Flood Force STRYKER:



### Water Warriors AVENGER and Flood Force STORM:



## Water Warriors ARGON and Flood Force TSUNAMI:





## Water Warriors XENON and Flood Force AVALANCHE:





The nature of the water squirting toys market is that sales are highly concentrated in the summer months. *Id.* ¶ 30.  Trends and styles of toys often vary from year to year and sales of styles from previous years may be difficult to sell. *Id*.

### d. *Third Party Water Squirting Toys*

Several third parties sell water squirting toys that are similar in appearance to the Water Warriors Product Line. *Id.* ¶ 20.  For example, FunX Toys sells its Stealth Drencher F4 water squirting toys that make use of nearly every aspect of Buzz Bee's alleged KWIK GRIP XL Trade Dress.  *See id.* ¶ 21 and Ex. E.  A side-by-side comparison of the FunX toy and Water Warriors KWIK GRIP XL toy is shown in the Balam Decl. Ex. F.  The FunX Stealth Drencher F4 toys are sold through Five Below retail stores and online through Amazon.com.  *See id.* Ex. E. In addition, numerous other manufacturers sell water squirting toys that are visually similar to the overall designs of each of the toys in the Water Warriors Line and contain some or all of the alleged Water Warriors Trade Dress.  *See id.* Exs. G-M.

## III.   LEGAL STANDARDS

### a. *Preliminary Injunction*

A party seeking a preliminary injunction must demonstrate that each of the following factors favors the requested relief: (1) the likelihood that the moving

party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 356-357 (3d Cir. 2007). All four of the above factors must favor the grant of preliminary relief before a court may issue a preliminary injunction. *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).[4] Further, a preliminary injunction is an "extraordinary remedy" and "should be granted only in limited circumstances." *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1426–27 (3d Cir. 1994) (citation omitted).

### b. *Trade Dress Rights in Product Design*

To establish infringement of unregistered trade dress, a plaintiff bears the burden of proving that (1) the allegedly infringed features are non-functional, (2) the features are inherently distinctive or have acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product. *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003).

---

[4] Buzz Bee cites *Am. Civil Liberties Union of N.J. v. Black Horse Pike Regional Bd. of Educ.* for the proposition that a district court should "balance[] these four…factors to determine if an injunction should issue." 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (*en banc*); *see* Pl. Br. 17. However, that quote is wholly absent from the cited case and is not the relevant legal standard.

First, a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article" and exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (U.S. 1995), quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 10 (1982).  Any party asserting infringement of unregistered trade dress bears the burden of proving the matter sought to be protected is not functional. Lanham Act, 15 U.S.C. § 1125(a)(3).

Second, product design trade dress is never inherently distinctive and a party asserting trade dress protection in a product design must prove secondary meaning. *See Wal-Mart*, 529 U.S. at 216.  "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  *Inwood Labs.*, 456 U.S. at 851.  Further, "[p]roduct design almost invariably serves purposes other than source identification. Allowing competitors to copy will have salutary effects in many instances."  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 121 S. Ct. 1255, 1260 (U.S. 2001) (quoting *Wal-Mart*, 529 U.S. at 213).

Third, only after a party has met its burden of proving that it in fact has protectable rights in the alleged trade dress does a court need to consider whether

there is a likelihood of confusion between the relevant products.  A likelihood of confusion exists when consumers viewing the trade dress would probably assume that the plaintiff's product is associated with the source of a different product identified by plaintiff's trade dress.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000).  Courts should weigh several factors[5] to determine whether a likelihood of confusion exists: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not in competition, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.  *Versa*, 50 F.3d at 202 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978)).  "[N]ot all of the factors will be appropriate for or function the same

---

[5] The factors are collectively referred to herein as the "Lapp factors", referring to *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir.1983).

way with respect to trade dress inhering in a product configuration" as in a traditional trademark analysis. *Id*.

## IV.  LEGAL ARGUMENT

### a.  *Buzz Bee has Not Shown a Likelihood of Success on the Merits*

As demonstrated below, because nearly every element of Buzz Bee's alleged trade dress is functional, unprotected as lacking secondary meaning, and furthermore unlikely to be confused with SwimWays' Flood Force Line, Buzz Bee has failed to show a likelihood of success on the merits.  Therefore, this Court should deny Buzz Bee's request for a preliminary injunction.

### i.  Buzz Bee's Alleged Trade Dress is Invalid because it Attempts to Bar Others from Using Non-Source Identifying Features

Buzz Bee has failed to show (a) that its alleged trade dress is non-functional and (b) that its alleged trade dress has acquired secondary meaning among consumers.  Therefore, Buzz Bee has failed to carry its burden of proving that it has any protectable rights in its Water Warriors Product Line.

#### (a) *Buzz Bee's Alleged Trade Dress is Functional*

Buzz Bee alleges, without factual support, that its WATER WARRIORS Trade Dress is "wholly non-functional."  Buzz Bee relies solely on the statements by Mr. Zimmerman that the "functional features of the [] water squirting toys, namely, the parts that function to spray water, are internal and not visible during normal use or sale."  *See* Zimmerman Decl. ¶¶ 21, 34, 47, 60.  However, simply

because the spraying mechanisms are internal does not mean that many of the external features are non-functional.  This conclusory statement, without any supporting facts, is insufficient for Buzz Bee to carry its burden of proving that its alleged trade dress is non-functional.

Further, as demonstrated below, there are serious doubts as to the alleged non-functionality of the WATER WARRIORS Trade Dress.  Specifically, at least the orange muzzle, transparent reservoir design, and bright external coloration portions of the AVENGER Trade Dress, XENON Trade Dress, KWIK GRIP XL Trade Dress and ARGON Trade Dress are functional as a matter of law because each is mandated by federal law.  Department of Commerce regulations on imitation and toy guns state that "no person shall manufacture … any toy, look-alike, or imitation firearm covered by § 1150.1 unless such device contains, or has affixed to it, one of the markings set forth in § 1150.3." 15 C.F.R. § 1150.2 (2014).  The qualified markings include (i) a blaze orange solid plug permanently affixed to the muzzle end or exterior surface of the barrel, (ii) transparent construction of the device, or (iii) bright external coloration of the entire surface of the product.[6]  *See* 15 C.F.R. § 1150.3 (2014).  Therefore, the blaze orange plug, transparent reservoir

_____

[6] Acceptable color schemes include "[c]oloration of the entire exterior surface of the device in white, **bright red, bright orange, bright yellow, bright green, bright blue,** bright pink, **or bright purple**, either singly or as the predominant color in combination with other colors in any pattern."  *See* 15 C.F.R. §1150.3(d) (emphasis added).

designs, and bright external coloration elements of Buzz Bee's alleged trade dress are used to comply with these regulations and competitors, such as SwimWays, should be free to make use of these elements to also comply with the law. Thus, those features are functional and ineligible for trade dress protection as a matter of law.

Further, numerous other claimed trade dress elements are functional because they affect the use and purpose of the water squirting toys. The shape of the nozzle heads of the AVENGER toy, among others, is functional because the round shape improves the user's ability to rotate between spray settings. *See In re Udor USA Inc.*, 89 U.S.P.Q.2d 1978, 1985, 2009 WL 576139 (T.T.A.B. 2009) ("[T]he round disk shape" of the nozzle head is "efficient, economical and advantageous" and thus functional); *see generally* Zimmerman Decl. Ex. A. The semi-transparent cover of the KWIK GRIP XL reservoir is functional because it allows the user to determine the level water in the water squirting toy. *See* Balam Decl. ¶ 24. The ridged designs of the pumps and handles in the Water Warriors Product Line improves grip by allowing children to place their fingers between the ridged portions and minimize slippage on the grips when wet. *See* Zimmerman Decl. Exs. C, G, I, and M (packaging showing child's fingers between the ridges on the pumps and grips); Balam Decl. ¶ 25. The trigger guards of the KWIK GRIP XL, ARGON, and XENON water squirting toys are functional because they protect the

user from accidentally firing the toys.  *See id.* ¶ 26.  Therefore, each of the above features is functional because they affect the use or purpose of the water squirting toys by improving the usefulness of each toy.

Courts in this Circuit have repeatedly held that proof of non-functionality requires a showing that the alleged trade dress elements serve <u>no purpose</u> other than as a source identifier.  *Merch. & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.*, 963 F.2d 628, 633 (3d Cir. 1992).  Here, for the reasons set forth above, Buzz Bee has failed to meet that heavy burden.

### (b) *Buzz Bee Has Failed to Show its Alleged Trade Dress has Acquired Secondary Meaning*

First, Buzz Bee feebly attempts to argue that its "products themselves are integral parts of, and are in effect, the packaging displays" and are therefore inherently distinctive, thus seeking to overcome the hurdle of proving secondary meaning for its product design trade dress.  Pl. Br. 21.  However, Buzz Bee has not cited any case law to support this point, likely because such support does not exist.[7]  Therefore, Buzz Bee has no legal basis to claim its product designs are inherently distinctive and must prove that its alleged product design trade dress has acquired secondary meaning among consumers.

---

[7] Buzz Bee's argument also fails because its XENON and ARGON packaging do not prominently display the alleged trade dress.  Instead, the packaging hides large portions of the product design from view.  *See* Zimmerman Decl., Exs. I and M.

"Factors relevant to a finding of secondary meaning in a product configuration include: (1) plaintiff's advertising expenditures, measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature; (2) consumer surveys linking the distinctive product configuration to a particular, single source (although the identity of the source need not be known); and (3) length and exclusivity of use." *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1452 (3d Cir. 1994) (internal quotations omitted).

As to advertising expenses, Buzz Bee has not provided <u>any</u> evidence as to such expenditures. Courts in this Circuit have held that even tens of millions of dollars of advertising expenditures may be insufficient to support a finding of secondary meaning. *Euro Pro Corp. v. Tristar Products, Inc.*, 172 F.Supp.2d 567, 573 (D.N.J. 2001) ($7 million of advertisements that did not focus on the alleged trade dress feature held insufficient); *Tyco Indus., Inc. v. Tiny Love, Ltd.*, 914 F. Supp. 1068, 1072 (D.N.J. 1996) ($2 million in sales and $50,000 in advertising expenditures insufficient to show secondary meaning.).  Further, Buzz Bee's product packaging and website do not highlight the supposedly distinctive trade dress features as source identifiers. *See* Zimmerman Decl. Exs. A, C, E, G, I, M. Here, the absence of <u>any</u> evidence of advertising expenses, let alone expenses

relating to ads highlighting the supposed trade dress features, weighs overwhelmingly in favor of finding that secondary meaning is absent here.

As to consumer surveys, Buzz Bee has failed to provide any evidence on this factor. Self-serving declarations from Buzz Bee's president do not substitute for consumer evidence. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 910 (9th Cir.1995) (declarations from plaintiff's employees and wholesalers had "little probative value regarding the assessment of consumer perception" because "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark"). Therefore, this factor also weighs heavily against a finding of secondary meaning.

As to length of use, Buzz Bee alleges that its sales over periods of four to eleven years establish secondary meaning. *See* Zimmerman Decl. ¶¶11, 24, 37, 50. To support its argument, Buzz Bee falsely states that the Trademark Office accepts five (5) years of exclusive use as *prima facie* evidence of trade dress secondary meaning. *See* Pl. Br. 23. To the contrary, Lanham Act § 2(f) states that the Director "may" accept five years use as prima facie evidence. 15 U.S.C. § 1052(f) (2014). However, for product designs and other matter that is not inherently distinctive due to its nature, the Trademark Office requires <u>actual evidence</u> "that the mark is perceived *as a mark* for the relevant goods or services" and five years

of use is not sufficient to show acquired distinctiveness. *See* Trademark Manual of Examining Procedure (TMEP) §1212.05(a) (emphasis added); *In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1 (Fed. Cir. 1984) (configuration of pistol grip water nozzle for water nozzles); *see generally In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985). Therefore, Buzz Bee's reliance on this presumption is misplaced. Moreover, Buzz Bee has failed to come forward with any actual evidence that the alleged trade dress is perceived by consumers as having source significance.

Further, Buzz Bee has not come forward with any evidence to overcome the presumption of abandonment of its alleged rights in its XENON and ARGON Trade Dress based on nearly five years of non-use. *See* N.J. STAT. ANN. 56:3-13.1a (West 2014) (2 years non-use prima facie evidence of abandonment); 15 U.S.C. § 1127 (2014) (3 years non-use prima facie evidence of abandonment). Buzz Bee's self-serving conclusory statements in this regard are insufficient to show that it has maintained an intent to resume use of the alleged trade dress. *See Self–Realization*, 59 F.3d at 910.

The only other evidence that Buzz Bee has come forward with regarding secondary meaning is that of alleged sales success. *See* Zimmerman Decl. ¶¶ 11-13, 24-26, 37-39, 50-52. However, "[s]ales success by itself will typically not be as probative of secondary meaning in a product configuration case" because such

success is often attributed to the desirability of the product configuration rather than as a source identifier. *Duraco,* 40 F.3d at 1452.  Further, even in that regard, Buzz Bee fails to provide any evidence as to its market share or the overall size of the relevant market to place its sales numbers in context.  Moreover, Buzz Bee's sales numbers for its KWIK GRIP XL toys are misleading because those figures relate to <u>both</u> variations of its KWIK GRIP XL guns, only one of which is at issue in this suit.  *See* Pl. Br. 6.  Therefore, if relevant at all, its KWIK GRIP XL sales figures should be reduced by two-thirds.[8]

The *Wolf* and *Blumenthal* cases cited by Buzz Bee are also distinguishable from the facts here.  In *Wolf*, the plaintiff generated over $800 million in revenue through sales of 325,000 units over 10 years and spent over $41 million in advertising that prominently featured and described the trade dress as "distinctive red knobs" that were an "exclusive Wolf feature." *Wolf Appliance, Inc. v. Viking Range Corp.*, 686 F. Supp. 2d 878, 884 (W.D. Wis. 2010).  Here, advertising figures are wholly absent and Buzz Bee has not provided any advertisements that tout the alleged trade dress features as source identifiers.

Further, the *Blumenthal* court found secondary meaning based primarily on a finding that defendant's intentional copying weighed in favor of secondary

---

[8] These figures are further cast in doubt because it appears that Buzz Bee started selling the design at issue around 2003, redesigned them in 2008, and then switched back to the old designs sometime thereafter.  *See* Balam Decl., Ex. N. Thus, its sales figures dating back to 2003 appear to be misleading.

meaning.  *See Blumenthal Distrib. V. Exec. Chair, Inc.*, 2010 U.S. Dist. LEXIS 142193, at *26 (E.D.N.Y. Nov. 9, 2010).   Here, even assuming Buzz Bee can somehow prove that SwimWays intentionally copied its product designs, evidence of intentional copying does not strongly support an inference of secondary meaning.  *See Gen. Motors Corp. v. Lanard Toys, Inc.,* 468 F.3d 405, 419 (6th Cir. 2006) ("Intentional copying ... is only one of many considerations in the [multi]-factor test and does not alone establish secondary meaning."); *Good'N Natural v. Nature's Bounty, Inc.*, 1990 WL 127126, at * 12 (D.N.J. Aug. 30, 1990) ("[T]he better rule is that evidence of intentional copying may be corroborative of other circumstantial evidence of secondary meaning, but is insufficient by itself to establish that meaning.").[9]

Finally, as to exclusivity of use, the alleged Water Warriors Trade Dress is not exclusive to Buzz Bee.  For example, the FunX Toys Stealth Drencher F4 and numerous other designs make use of nearly <u>all</u> of the alleged trade dress features of each product in the Water Warriors Product Line.  *See* Balam Decl. Exs. E-M. Specifically, the FunX Stealth Drencher F4 copies <u>every</u> element of the alleged trade dress except the "semi-transparent dome fill tank."  *See id.* Ex. F.  Further, several other websites display similar water squirting toys bearing nearly identical

---

[9] Furthermore, even if this Court weighs this factor in favor of secondary meaning, intentional copying carries <u>no weight</u> towards a finding of likelihood of confusion unless the "product's labeling and marketing is also affirmatively misleading." *Versa*, 50 F.3d at 208.

features.  *See id.* Exs. G-M.  Therefore, Buzz Bee's lack of exclusivity of nearly all of its alleged trade dress features weigh against a finding of secondary meaning because consumers do not view the features as identifying a single source.

Accordingly, Buzz Bee has failed to carry the heavy burden of proving its alleged Water Warriors Trade Dress has acquired secondary meaning among consumers.

### ii.  Buzz Bee Has Failed to Show a Likelihood of Confusion

Even assuming for the sake of argument that Buzz Bee has established non-functionality and secondary meaning (which it has not, as discussed above), Buzz Bee's trade dress claims fail because it has not shown that reasonably prudent consumers are likely to confuse the Water Warriors Product Line with the Flood Force Line.[10]

(a) ***The Product Designs are Dissimilar in Appearance and the Product Packaging and Labeling is Substantially Different (Lapp Factor # 1)***

Substantial similarity of trade dress in a product configuration case does not by itself strongly suggest a likelihood of confusion.  *Versa,* 50 F.3d at 202.  "Since substantially identical products are often sold by different manufacturers under different names, consumers are accustomed to relying on product packaging and

---

[10] "Unless very narrowly tailored, deterrents to copying of product designs—as opposed to product packaging or trademarks—would inhibit even fair competition, thus distorting the Lanham Act's purpose."  *Versa*, 50 F.3d at 207.

trademarks to identify product sources." *Id.* at 201. "[I]n trade dress infringement suits where the dress inheres in a product configuration, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements." *Id*. at 203.

Here, Buzz Bee does not even attempt to argue that the packaging for its Water Warriors Product Line is confusingly similar to SwimWays' Flood Force Product Line packaging. Therefore, Buzz Bee has failed to even address crucial aspects of the likelihood of confusion analysis.

Further, as Buzz Bee concedes, the proper test is not a side-by-side comparison of the products. Pl. Br. 28. Instead, the products and their packaging as a whole must be compared to determine whether they convey the same overall commercial impression and whether consumer confusion is likely. Here, whether through side-by-side comparison or separate comparison of the products in their packaging, consumers are likely to appreciate the vastly different product designs, packaging, labeling, color schemes, graphics and clearly visible brand names on each product. *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972) ("The presence of [the source's] name on the product [stereo speaker cabinets] goes far to *eliminate* confusion of origin.") (emphasis added); *id*. at 310 ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.").

Therefore, even if the Court views the product designs and alleged trade dress elements as being substantially similar, the clarity of the product's labeling, packaging, and advertisements heavily weigh this factor in favor of Defendants.

(b) ***Buzz Bee's Trade Dress Is Weak (Lapp Factor # 2)***

Buzz Bee alleges that the "significant commercial success" of its Water Warriors Product Line weighs in favor of finding its trade dress is strong. However, as discussed above, this Circuit has repeatedly held that commercial success alone is insufficient to prove secondary meaning or strength of a mark. *Duraco*, 40 F.3d at 1452.

Further, Buzz Bee's alleged Water Warriors Trade Dress is weak because Buzz Bee has not provided any evidence that consumers rely on its product configurations as source indicators. *Versa*, 50 F.3d at 203-04 ("courts should require evidence of actual *reliance* by consumers on a particular product configuration as a source indicator before crediting that configuration's 'strength' toward likelihood of confusion.") (emphasis in original). Therefore, this factor weighs in favor of Defendants.

(c) ***The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase (Lapp Factor # 3)***

While the price of the goods and the attention paid by consumers is relevant to the issue of likelihood of confusion, clear labeling is both "legally and factually

sufficient" to remedy confusion when consumers exercising ordinary care purchase substantially identical products. *Versa*, 50 F.3d at 204 ("While it might be shown that consumers *in fact rely* on a particular product's configuration to identify its source, such deviation from the normal pattern (i.e., from reliance on trademarks, packaging, and advertising) would be rare.") (emphasis in original).

Here, Buzz Bee has not come forward with any evidence to show that consumers exercise less than ordinary care when purchasing water squirting toys. While the goods at issue are relatively inexpensive, that fact alone does not support a finding of a low standard of care. To the contrary, parents purchasing toys for their children are likely to exhibit at least ordinary care when purchasing toys for their children. *See* Balam Decl. ¶ 29. Further, logically it is unlikely that 4-12 year olds, typically without any means of income or transportation, would travel to Target or other retail stores without parental supervision to purchase the relevant products. Therefore, even assuming that children exhibit a lower standard of care, which Defendants do not concede, parents of such children are the likely consumers of the parties water squirting toys. Accordingly, because the clarity of the labeling, packaging, and advertising for the relevant products are legally and factually sufficient to remedy any potential confusion here, this factor weighs in favor of Defendants.

### (d) *Length of Use and Evidence of Actual Confusion (Lapp Factors # 4 and 6)*

The fourth Lapp factor, "the length of time defendant has used the mark without evidence of actual confusion arising", and the sixth Lapp factor "evidence of actual confusion", if proven, may weigh in favor of a likelihood of confusion.

Here, the Water Warriors Product Line and Flood Force Product Line have been sold together in the market for less than one year without any credible known instances of actual confusion. Therefore, the fourth factor should carry little or no weight here.

Buzz Bee alleges a single instance of "actual confusion based on a website's reference to the SwimWays STRYKER toy as "reshells" of the KWIK GRIP XL toys. *See* Zimmerman Decl. ¶ 73, Ex. Z. However, a closer review of that website shows that the blogger was not confused as to the products' source, but was merely commenting that the products looked similar. Specifically, the blogger describes the SwimWays AVALANCHE as a "close copy" of the XENON, and the TSUNAMI as "a copy" of the ARGON. *Id.* The blogger's acknowledgment that the products are similar or copies does not equate to a mistaken belief that the sources of the products are related. This is not evidence of consumer confusion, but merely a sophisticated blogger understanding that a new toy manufactured by a different company resembled a toy he previously reviewed on his blog. Further, the blogger notes that each toy "use[s] old blaster molds", but notes that each has

distinguishing features, such as the pinch triggers and different valve mechanisms. *Id*.

Furthermore, even assuming such evidence equates to actual confusion, a single instance of actual confusion is insufficient to weigh this factor in favor of Buzz Bee.  *See McNeil*, 511 F.3d at 366 ("neither precedent nor common sense supports" finding that a single instance of confusion compels weighing this factor in favor of plaintiff).

Therefore, both of these factors weigh in favor of Defendants.

### (e) *SwimWays' Intent is Irrelevant (Lapp Factor # 5)*

Buzz Bee cites numerous cases to support its theory that evidence of intentional copying weighs heavily in favor of finding confusion likely.  However, this reliance is both misleading and misplaced, as those cases (i) are not binding precedent in this Circuit and/or (ii) do not relate to trade dress infringement.

Here, the relevant standard was articulated by the *Versa* court:

> [W]e hold that, in the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion *only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading*.

*Versa*, 50 F.3d at 208 (emphasis added).

Here, Buzz Bee has not proven that SwimWays intentionally copied its alleged trade dress by clear and convincing evidence.  Even assuming arguendo

that Buzz Bee can show that SwimWays intentionally copied Buzz Bee's product designs (although SwimWays does not concede this fact), Buzz Bee has provided no evidence of *intent to deceive or confuse* consumers, let alone proven that allegation by clear and convincing evidence. *Id.* at 206 ("there is little basis in fact or logic for supposing from a defendant's *intent* to copy (without more) that the defendant's *actions* will in fact result in confusion"). Similarly, as discussed above, Buzz Bee has not alleged or provided any evidence that SwimWays' product labeling and marketing are also affirmatively misleading. Therefore, this factor weighs heavily in favor of Defendants and against a likelihood of confusion.

(f) ***The Channels of Trade, Overlapping Consumers, Relationship of the Goods in the Minds of Consumers, and Other Factors are Largely Irrelevant for Product Configuration Cases (Lapp Factors # 7, 8, 9, 10)***

In the product configuration context, Lapp factors 7-10 "rarely need to be considered" because "the goods at issue will almost by definition be in competition." *Id.* at 208 ("Bearing in mind that these factors also were developed for non-competing products, we believe that they are largely superfluous in product configuration cases."). Here, the channels of trade, relevant consumers, and relationship of the goods are inevitably similar because the products compete with one another. However, these factors should carry little, if any, weight in this context because those factors are designed for non-competing products in the more traditional trademarks context, not for product configuration trade dress.

27

### b. *Buzz Bee has Not Shown That It Would Suffer Immediate Irreparable Injury if an Injunction Is Not Granted*

In its motion, Buzz Bee alleges that it will suffer reputational harm, loss of goodwill, and decreased sales if SwimWays' Flood Force Line is not taken off of Target's shelves.   Zimmerman Decl. ¶¶ 79-82.   However, Buzz Bee makes no attempt to come forward with any actual evidence to support those allegations relating to irreparable harm.   Instead, Buzz Bee relies solely on these conclusory allegations and the alleged presumption of irreparable harm once a likelihood of confusion is established.   Buzz Bee's reliance on this supposed presumption is misplaced.

The Third Circuit has previously held that "once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury."   *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998); *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) (trademark infringement amounts to irreparable injury as a matter of law).   However, this presumption should no longer apply in light of the Supreme Court's decisions in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) and *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).   In *Winter*, the Supreme Court clarified that a party must show that irreparable harm was not only *possible*, but in fact *likely*.   *Winter*, 555 U.S. at 22 (emphasis added).

28

In *eBay*, the Supreme Court rejected a presumption of irreparable harm in a patent case and held that a party must come forward with actual evidence to establish irreparable harm according to the traditional principles of equity. *eBay*, 547 U.S. at 391 ("a major departure from the long tradition of equity practice should not be lightly implied"). Absent clear Congressional intent to stray from the traditional principles of equity, courts should not presume irreparable harm. *See id.* at 391-92. Like the Patent Act, which states that injunctions "may" issue "in accordance with the principles of equity," the Lanham Act, provides that injunctions may issue according to the "principles of equity." 35 U.S.C. § 283 (2014); 15 U.S.C. § 1116(a) (2014). Nothing in either Act indicates that Congress intended Courts to stray from traditional principles of equity and presume irreparable harm. *eBay*, 547 U.S. 391-92 ("Nothing in the Patent Act indicates that Congress intended such a departure."); *Salinger*, 607 F.3d at 78-79 ("*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in *any context*.") (emphasis added).

Last year, this Court followed *eBay* and *Winter* by holding that irreparable harm cannot be presumed in Lanham Act false advertising cases. *Ferring Pharms. Inc. v. Watson Pharms, Inc.*, No. 12-cv-05824, 2013 WL 1405226, at *4 (D.N.J. April 4, 2013), citing *King Pharm. Inc. v. Sandoz, Inc.*, No. 08–5974, 2010 WL 1957640, at *5 (D.N.J. May 17, 2010) (Irreparable harm "must be established as a

separate element, independent of any showing of likelihood of success.") (citing *Winter*, 555 U.S. at 21-22); *see also Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555 (W.D. Pa. 2013) (refusing to apply presumption of irreparable harm in trade dress case. Preliminary injunction denied). The *Ferring* case is currently on appeal to the Third Circuit. *Ferring Pharms. Inc. v. Watson Pharms, Inc.*, No. 13-2290 (3rd Cir. argued Feb. 12, 2014). Therefore, this Court should apply similar reasoning to these facts and refuse to presume irreparable harm here.

Other circuits have also recently held that the presumption of irreparable harm does not apply in trademark and copyright cases after *eBay*. *Herb Reed Enterprises, LLC v. Florida Entertainment Opinion Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013) ("We now join other circuits in holding that the eBay principle—that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case."); *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) (copyright case stating that "[a]fter eBay, courts must not simply presume irreparable harm."); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228–29 (11th Cir. 2008) (applying the requirement to a preliminary injunction in a trademark infringement action); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (applying the requirement to a permanent injunction in a trademark infringement action). Therefore, this Court

should not presume irreparable harm and should require that Buzz Bee come forward with actual evidence of potential future irreparable harm.

Especially without the presumption of irreparable harm, Buzz Bee's evidence falls far short of proving future irreparable harm. Buzz Bee relies on statements of its own President, Jeffrey Zimmerman, stating that irreparable harm is present here. Zimmerman Decl. ¶¶ 80-81. However, these conclusory statements are not supported by any factual evidence of irreparable harm. *See Aurora World, Inc. v. Ty, Inc.*, 719 F. Supp. 2d. 1115, 1145 (C.D. Cal. 2009) (plaintiff failed to prove irreparable harm where it offered insufficient evidence of an established reputation, lost sales, and lost market share).

Moreover, as discussed in detail above, Buzz Bee has failed to enforce its alleged trade dress rights against other similar product designs within the industry, undercutting the basis for its alleged trade dress. *Warner-Lambert Co. v. McCrory's Corp.*, 12 U.S.P.Q.2d 1884, 1887 (D.N.J. 1989) (Failure to take action for six years against third party users of its trade dress weakens its claim of irreparable injury. Preliminary injunction denied.).

Because Buzz Bee has failed to meet its burden of proof as to likelihood of confusion and failed to show a likelihood of success on the merits, as discussed above, there cannot be irreparable harm to Buzz Bee. However, even if the Court is persuaded that Buzz Bee has met its burden on those issues, Buzz Bee has failed

to come forward with any evidence of established reputation, lost sales, lost market share, other any other evidence of future harm and therefore has failed to show irreparable injury.  Accordingly, this Court should find that Buzz Bee has not met its burden of proof as to irreparable harm.

### c.  *Defendants Will Suffer Irreparable Harm If the Injunction Is Issued*

"The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating."  *Ill. Tool Works, Inc. v. Grip--Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).  Here, SwimWays will be harmed if it is required to pull all of its products off Target's shelves because the water squirting toys market is seasonal.  *See* Balam Decl., ¶ 30.  If SwimWays is forced to pull its products and ultimately succeeds at trial, it will be difficult for it to sell off its toys at a later point because toy trends vary from year to year. *Genovese Drug Stores, Inc. v. TGC Stores*, 939 F. Supp. 340, 351 (D.N.J. 1996) ("In essence, plaintiff would improperly benefit from a permanent injunction" without ever having proved its claims.).

In contrast, Buzz Bee's claim of hardship consists only of conclusory statements regarding its goodwill that are not based on actual evidence of confusion.  Pl. Br. 34.  Further, for the reasons stated in this brief, Buzz Bee is not likely to show a likelihood of confusion. Therefore, the only hardship Buzz Bee

currently experiences is the result of legitimate competition between distinct brands.

### d. *The Equities and Public Interest Favor Defendants*

While Buzz Bee tosses around loaded words like "counterfeiting" and "knock-offs", the fact remains that Buzz Bee has failed to come forward with any credible instances of actual confusion between the parties' products and there are serious doubts that Buzz Bee can carry its burden of proof as to likelihood of confusion, secondary meaning, and non-functionality.  Therefore, the Court should place the public interest in fair competition above any speculative harm to Buzz Bee. *Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555 (W.D. Pa. 2013) (denying motion for preliminary injunction even after finding a likelihood of confusion because public interest disfavors fewer choices in the marketplace), citing *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir.1993) (affirming a finding that the public interest would not benefit because granting injunctive relief would deprive consumers of a choice of products).  Balancing the hardships to the parties and the public interest in fair competition, the Court should deny Buzz Bee's motion.

## V.    CONCLUSION

SwimWays has fairly competed with Buzz Bee in the marketplace by creating its own Flood Force Product Line of competing water squirting toys under

its distinct SwimWays and Flood Force brands using unique packaging that readily informs consumers that its products are in no way related to Buzz Bee or Buzz Bee's Water Warrior products. As demonstrated above, Buzz Bee has failed to carry its burden of proving its trade dress is non-functional, has acquired secondary meaning, and that consumer confusion is likely. Therefore, Buzz Bee has fallen short of proving that it is entitled to preliminary injunctive relief in this case.  For these reasons and for the reasons set forth above, the Court should deny Buzz Bee's motion for preliminary injunctive relief.

<div style="margin-left: 40%;">

SWIMWAYS CORPORATION and
TARGET CORPORATION

By:    s/ Joel Max Eads
      Joel Max Eads, Esquire
      **TRENK, DIPASQUALE, DELLA
       FERA & SODONO, P.C.**
      347 Mount Pleasant Avenue
      Suite 300
      West Orange, NJ 07052
      (973) 243-8600
      (973) 243-8677 (fax)
      jeads@trenklawfirm.com

</div>

Craig L. Mytelka
Virginia State Bar No. 31652
WILLIAMS MULLEN, P.C.
222 Central Park Avenue, Suite 1700
Virginia Beach, VA 23462
Telephone: (757) 499-8800
Facsimile: (757) 473-0395
cmytelka@williamsmullen.com

Martin W. Hayes

Virginia State Bar No. 82204
WILLIAMS MULLEN, P.C.
8300 Greensboro Drive, Suite 1100
Tysons Corner, VA 22102
Telephone: 703.760.5245
Facsimile: 703.748.0244
mhayes@williamsmullen.com

*Counsel for Defendants*

Dated: May 5, 2014

25417335_5

4821-7390-7738, v.  2