IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BUZZ BEE TOYS, INC.,

                    Plaintiff,

          v.

SWIMWAYS CORPORATION, et al.,

                    Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 14-1948 (JBS/KMW)

**OPINION**

APPEARANCES:

Michael F. Snyder, Esq.
John Sullivan, Esq.
John O'Malley, Esq.
Volpe & Koenig PC
United Plaza
Suite 1600
30 South 17th Street
Philadelphia, PA 19103
     Attorneys for Plaintiff Buzz Bee Toys, Inc.

Richard Trenk, Esq.
Joel Max Eads, Esq.
Trenk DiPasquale Webster Della Fera & Sodono, P.C.
The Times Building, Suite 402
32 Parking Plaza
Ardmore, PA 19003
     -and-
Craig L. Mytelka, Esq.
Williams Mullen, P.C.
222 Central Park Avenue, Suite 1700
Virginia Beach, VA 23462
     -and-
Martin W. Hayes, Esq.
Williams Mullen, P.C.
8300 Greensboro Drive, Suite 1100
Tysons Corner, VA 22102
     Attorneys for Defendants Swimways Corporation and Target
     Corporation

**SIMANDLE, Chief Judge:**

I. ......INTRODUCTION                                                        2
II. .....BACKGROUND                                                         4
  A.   Factual Background                                             4
    1.  Plaintiff Buzz Bee                                           4
    2.  Plaintiff's WATER WARRIORS Product Line                       5
    3.  Swimways' FLOOD FORCE Product Line                           10
    4.  Defendants' Alleged Infringement                             11
    5.  Third Parties' Water Shooter Toys                            13
    6.  Impact of the Alleged Infringement on Plaintiff              14
  B.   Parties' Arguments                                             15
III. ..STANDARD OF REVIEW                                                    17
IV. .....DISCUSSION                                                          18
  A.   Likelihood of Success on the Merits                           18
    1.  Functionality of the Trade Dress                             19
    2.  Secondary Meaning                                            22
    3.  Likelihood of Confusion                                      39
  B.   Irreparable Harm                                               51
    1.  Irreparable Harm Must Be Independently Established           52
    2.  Likelihood of Irreparable Harm                               58
  C.   Public Interest                                                61
V. ......CONCLUSION                                                          61

## I. INTRODUCTION

This matter comes before the Court on the motion [Docket Item 12] of Plaintiff Buzz Bee Toys, Inc., ("Buzz Bee") for a preliminary injunction against Defendants Swimways Corporation ("Swimways") and Target Corporation ("Target"). Buzz Bee claims that Defendant Swimways copied four models of Plaintiff's WATER WARRIORS waterguns by using confusingly similar and infringing trade dresses and that Defendant Target now offers Swimways' infringing products instead of Plaintiff's products, which Target used to offer. (Am. Compl. ¶ 99.) Plaintiff's principal

claim for purposes of this preliminary injunction motion is that the Defendants have infringed Plaintiff's unregistered trade dress in violation of § 43(a) of the Lanham act, 15 U.S.C. § 1125(a).[1] The Court held a preliminary injunction hearing on May 14, 2014.

Plaintiff seeks a preliminary injunction precluding Defendants from selling Swimways' allegedly infringing products and ordering them to recall the infringing products. Defendants' products are remarkably similar to Plaintiff's products, but Plaintiff's motion will be denied. A preliminary injunction is an extraordinary remedy that should only be used in limited circumstances. Plaintiff has not shown that these circumstances warrant injunctive relief: Plaintiff has not shown a likelihood of success on the merits because it has not shown that its trade dresses have acquired secondary meaning. In addition, Plaintiff has not shown that irreparable harm is likely, if the injunction does not issue.

---

[1] Plaintiff brought claims against Defendants for federal unfair competition and false designation of origin; New Jersey statutory unfair competition; New Jersey trademark counterfeiting; common law unfair competition; unjust enrichment; tortious interference with prospective economic advantage; and tortious interference with economic advantage. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367(a). The claims arising at state law have not been briefed or argued in this motion.

The following constitute the Court's findings of fact and conclusions of law in this preliminary injunction motion pursuant to Rule 65(a), Fed. R. Civ. P.

**II.  BACKGROUND**

  **A. Factual Background**

   **1. Plaintiff Buzz Bee**

Buzz Bee designs, markets, and distributes various toys, including water squirting toys. Buzz Bee was formed in 2002 and has less than 50 employees. (Zimmerman 2nd Decl. [Docket Item 37] ¶ 47.) Jeffrey C. Zimmerman has been Buzz Bee's president since 2002. (Zimmerman 1st Decl. [Docket Item 13] ¶ 1.) Since Zimmerman has worked for Buzz Bee, he has launched over 100 waterguns. (Zimmerman 2nd Decl. ¶ 40.) Only 10-15% of those toys have been successful enough to last more than one or two seasons. (Id.)

Buzz Bee's design process begins with meetings to decide what product is needed, and then the company designs, prepares drawings, determines a target price, engineers, and manufactures a hand sample. (Id. ¶ 19.) This initial process lasts five to six months. (Id.) The manufacturer then requires three to four months to produce commercial products. (Id.)

Buzz Bee packages its toy water shooters in open front packaging because customers wish to see the actual product before purchasing, because open packaging spotlights the product

4

design, and because water shooters with open packaging sell better than those with closed packaging. (Id. ¶ 60.)

Buzz Bee sells primarily through retail stores and does not advertise its toys; however, at least ten times per year, its water shooters are advertised in retailers' print advertising inserts. (Id. ¶ 62.) No such advertising, however, is in evidence. The annual value of the retailers' advertisements of Buzz Bee's products is estimated by Plaintiff as approximately $500,000.00. (Id.) Retailer customers, such as Target and Wal-Mart, have also advertised Buzz Bee's toys on their websites. (Id. ¶ 64.)

### 2. Plaintiff's WATER WARRIORS Product Line

Buzz Bee has a product line entitled WATER WARRIORS, which includes the AVENGER, KWIK GRIP XL, ARGON, and XENON water squirting toys, which are the four models whose trade dress Buzz Bee seeks to protect. WATER WARRIORS products are some of Buzz Bee's most popular models, and they represent approximately 25% of Buzz Bee's annual revenue. (Id. ¶¶ 50-51.) The target customers for these toys are children aged 4-12. (Zimmerman 1st Decl. ¶ 75.) Buzz Bee's president Zimmerman estimates that, until the current infringement, Buzz Bee's WATER WARRIORS had 35% of the relevant market share. (Zimmerman 2nd Decl. ¶ 49.) The WATER WARRIOR toys appear regularly on independent fan and

industry news sites like buffdaddynerf.com, isoaker.com, sscentral.org, and waterwar.net. (Id. ¶ 64.)

Zimmerman asserts that the WATER WARRIORS trade dresses are non-functional because the water squirting elements are internal mechanisms.

Plaintiff articulates the AVENGER's trade dress as:

(i) a raised portion along the top of the rear body portion, having a downwardly sloping body element crossing forwardly along the rear body portion, a forward wavy top projection and a forward wavy lower projection with a wave-like arcuate design pointing rearward formed between the top projection and the lower projection; (ii) an irregularly shaped inlay having a forward point located in the rear body portion; (iii) a front and bottom body portion having a complementary wave-like shape to meet the rear body portion, a grip portion having a raised back, a downwardly extending trigger guard portion having an arcuate design inlay pointing forward, a forward raised conical portion; (iv) a forward stock portion having three sloped ridges; and (v) a cylindrical orange muzzle portion.

(Am. Compl. ¶ 17 (letters referencing arrows on diagram omitted).) The AVENGER trade dress has been used since 2007. (Zimmerman 1st Decl. ¶ 11.)

AVENGER toys are sold through the internet, catalogs, and retail chains, such as Target and K-mart. (Id. ¶ 14.) Buzz Bee has not sold the AVENGER at Target for the last few years, but the product has been available at other retailers, including Kmart and Variety Distributors, continuously since its launch. (Zimmerman 2nd Decl ¶ 35.) Since 2007, 102,684 AVENGER units

have been sold and sales totaled $206,352.00. (Zimmerman 1st Decl. ¶¶ 12-13.) The AVENGER sells for between $4.99 and $5.99. (Id. ¶ 17.) Zimmerman claims that both consumers and the trade associate the AVENGER trade dress with Buzz Bee as the source. (Id. ¶ 18.)

Plaintiff articulates the KWIK GRIP XL[2] trade dress as:

(i) a semi-transparent dome fill tank; (ii) an oval body element overlaying the tank; (iii) a grip having two rear ridges; (iv) a trigger guard having a ridged inset at the front end of the trigger guard; (v) side and top arcuate body pieces; (vi) futuristic coil design element having three forwardly-slanted "bubble" protrusions and a forwardly pointing "bubble" arrow portion with a larger dot and a smaller dot; and (vii) a muzzle portion having horizontal ridges.

(Am. Compl. ¶ 36 (letters referencing arrows on diagram omitted).) The KWIK GRIP XL trade dress has been in use since 2003. (Zimmerman 1st Decl. ¶ 24.)

KWIK GRIP XL toys are sold through the internet, catalogs, and retail chains such as Target and Walgreens. (Id. ¶ 27.) KWIK GRIP XL toys are usually sold in three- or four-packs, and 2,033,223 KWIK GRIP XL units have been sold with total sales of $4,197,858.00. (Id. ¶¶ 25-26.) The suggested retail prices are $2.49 for one, $4.99 for the two-pack, $5.99 for the three-pack, and $9.99 for the four-pack. (Id. ¶ 30.)

---

[2] The KWIK GRIP XL had two variations, one of which is the focus of this lawsuit. (Pl. mot. at 6 n.6.) The other variation was offered in 2008, had minimal sales, and was pulled from the marketplace. (Zimmerman 2nd Decl. ¶ 30.)

Plaintiff articulates the ARGON trade dress as:

> (i) an upper tank portion defining the upper rear body; (ii) an overlaying side portion including an oval body element overlaying the tank, four futuristic bubble portions extending downward adjacent the oval body element, and two forwardly extending sweeping projections; (iii) a grip having a ridged handle portion; (iv) a lower central circular element in front of the trigger guard, having radial projections and ridges for a "sun-like" appearance; (v) a forward side element including two bubble-like forwardly sloping upward projections and a forward oval element; (vi) a forwardly pointing L-shaped projection along the upper front spine of the body, defining a triangular opening; (vii) a conical muzzle portion having raised trapezoidal ridges; and (viii) a ridged forestock grip.

(Am. Compl. ¶ 58 (letters referencing arrows on diagram omitted).) Over 368,000 ARGON units have been sold, and sales total $1,584,000.00. (Zimmerman 1st Decl. ¶¶ 38-39.) The ARGON is sold through the internet, catalogs, and retail chains such as Target and K-Mart. (Id. ¶ 40.) Its suggested retail price is $9.99. (Id. ¶ 43.)

Plaintiff articulates the XENON trade dress as:

> (i) an upper tank portion defining the upper rear body; (ii) a rearwardly pointing fang-shaped portion defining a sticker-receiving area; (iii) a grip having a ridged handle portion; (iv) a lower central circular element in front of the trigger guard, having radial projections and ridges for a "sun-like" appearance; (v) futuristic bubble projections on the sides of the body between elements (ii) and (iv); (vi) a forward side arrow-head shaped element having a notch in the rear portion; (vii) a forwardly pointing L-shaped projection along the upper front spine of the body, defining a triangular inset portion; (vii) a conical muzzle portion having raised fins; (viii) a ridges forestock grip; and (ix) an oval rear side element.

8

(Am. Compl. ¶ 80 (letters referencing arrows on diagram omitted).) At least 238,000 XENON units have been sold, and sales total $1,561,000.00. (Zimmerman 1st Decl. ¶ 52.) The XENON is sold through the internet, catalogs, and retail chains such as Target and Walgreens. (Id. ¶ 53.) Its suggested retail price is $14.99. (Id. ¶ 56.)

The XENON and ARGON trade dresses were used from 2004 to 2009, when Buzz Bee ceased selling the XENON and ARGON products due to a consent judgment with Hasbro Inc. resolving patent litigation relating to the internal mechanisms. (Id. ¶ 50; Zimmerman 2nd Decl. ¶ 36.) Buzz Bee plans to re-launch both products in 2015. (Zimmerman 2nd Decl. ¶ 36.) Since XENON and ARGON products are not on the market, and have not been sold for five years, there is no prospect that Defendants are causing harm at this time through sale of similar products, namely, the AVALANCHE and TSUNAMI, respectively.

Zimmerman asserts that "[t]he fact that Buzz Bee's AVENGER, KWIK GRIP XL, XENON, and ARGON water shooting toys have remained popular for so long is a testament to the value of those products' designs and their popularity with consumers." (Id. ¶ 40.) Again, this contention is unlikely to be proved with regard to the XENON and ARGON models that have not been sold for five years.

9

In August 2013, one of Target's buying agents informed Buzz Bee that Target would not stock the WATER WARRIORS line in 2014. (Zimmerman 1st Decl. ¶ 62.)

Buzz Bee has not obtained design patents for any of these models, nor does Buzz Bee allege trademark infringement.

### 3. Swimways' FLOOD FORCE Product Line

Swimways manufactures leisure and recreational water products. (Balam Decl. ¶ 3.)[3] In March 2013, Swimways met with Target to discuss expanding its offerings in Target stores. (Id. ¶ 5.) Swimways suggested a watergun product line. (Id. ¶ 7.) Swimways approached manufacturers and reviewed catalogs to determine which toys would sell at appropriate price points to fulfill Target's needs. (Id. ¶ 8.) Swimways picked ten models from a manufacturer's catalog and requested prototypes. (Id. ¶ 9.) Swimways allegedly believed that each design was a generic water squirting toy design. (Id. ¶ 9.) Swimways presented its prototypes to Target in May 2013 and, after discussions with the Target buyer, modified the toys. (Id. ¶ 10.)

Swimways presented the modified toys to Target at a line review in July 2013. (Id. ¶ 11.) Swimways agreed to offer its FLOOD FORCE line exclusively through Target. (Id. ¶ 12.) Shortly

---

[3] Jim Balam, Swimways' vice president of sales, submitted a declaration supporting Swimways' opposition to Plaintiff's motion. Balam has been Swimways' vice president of sales since November 2008. (Balam Decl. ¶ 1.)

after the review, Target informed Swimways that it would sell Swimways' toys for the upcoming season. (Id. ¶ 13.)

No evidence, at present, contradicts Swimways' assertions that its choice of these designs was based on a generic catalog rather than on its intentional copying of the Plaintiff's WATER WARRIORS designs.

Swimways' FLOOD FORCE line includes the AVALANCE, TSUNAMI, STORM, and STRYKER. (Id. ¶ 14.) Its target consumers are children aged 4-12. (Id. ¶ 29.)

### 4. Defendants' Alleged Infringement

Plaintiff purchased Swimways' STORM, STRYKER, TSUNAMI, and AVALANCHE toys from the Exton, PA Target store on February 7, 2014. (Zimmerman 1st Decl. ¶¶ 64, 66, 68, & 117.) Swimways' STORM cost $7.99. (Id. ¶ 64.) Plaintiff claims that Swimways' STORM exactly copies Buzz Bee's AVENGER. (Id. ¶ 65.) A three-pack of Swimways' STRYKER cost $5.99. (Id. ¶ 66.) Plaintiff claims that Swimways STRYKER exactly copies Buzz Bee's KWIK GRIP XL. (Id. ¶ 67.) Swimways' TSUNAMI cost $9.99. (Id. ¶ 68.) Plaintiff claims that Swimways' TSUNAMI exactly copies Buzz Bee's ARGON. (Id. ¶ 69.) Swimways' AVALANCHE cost $14.99. (Id. ¶ 70.) Plaintiff claims that Swimways' AVALANCHE exactly copies Buzz Bee's XENON. (Id. ¶ 71.) As noted above, however, Plaintiff's ARGON and XENON models have not been sold since 2009.

11

As evidence of the similarity between Buzz Bee's and Swimways' products, Plaintiff provided a February 12, 2014 post from the "BUFFDADDY NERF" blog, in which the blogger "ma[de] a large post covering air and water blasters . . . ." (Id. Ex. Z at 1.) The blogger provided pictures of Swimways products he had recently seen at Target and said that Swimways' AVALANCE was "[a] close copy of the Water Warriors Xenon," Swimways' TSUNAMI was "[a] copy of the Water Warriors Argon," Swimways' STRYKER units were "[r]eshells of one of the original Water Warriors Kwik Grips XL," and "there was also a piston blaster virtually identical to the Water Warriors Avenger." (Id. at 3-4.) The blogger noted that Swimways' toys "appear to use old blaster molds. However, they appear to have either pinch triggers, or some sort of alternative valve mechanism . . . ." (Id. at 3.)

Defendants note that various manufacturers, including Buzz Bee, were present at Target's July 2013 line review. (Balam Decl. ¶ 11.) Buzz Bee's president Zimmerman stated that participants in Target's July 2013 line review process were unaware which other entities were participating because each manufacturer was in a separate room displaying its products. (Zimmerman 2nd Decl. ¶ 22.) The Target buyer went into each room to view the displays and negotiate with the manufacturer. (Id.) Zimmerman emphasized that "[a]t no time do any of the manufacturers see their competitors' product line. However, . .

12

. it should have been readily apparent to the Target buyer, if they didn't already know, that the Swimways' product line was a copy of Buzz Bee's product line." (Id.)

Swimways claims that many of its products' features are functional. For example, transparent or semi-transparent reservoirs allows users to determine the water level and ridged handles and pumps improve grip. (Balam Decl. ¶¶ 24-26.) Swimways also asserts that various other design features, such as orange muzzles, are mandated by federal law.

Plaintiff attached to its reply brief pictures taken on April 26, 2014 in the Voorhees, NJ Target store. (Pl. reply Snyder Decl. Ex. 5 [Docket Item 38-5].) The pictures show, inter alia, SUPER SOAKER waterguns that are available for sale next to Swimways' products and that look nothing like Swimways' or Buzz Bee's products, despite having orange muzzles and ridges.

### 5. Third Parties' Water Shooter Toys

Swimways' vice president of sales, Balam, identified third parties selling water squirting toys similar to the WATER WARRIORS products. (Balam Decl. ¶ 20.) For example, Swimways alleges that FunX Toys sells the Stealth Drencher F4, which "make[s] use of nearly every aspect of Buzz Bee's alleged KWIK GRIP XL Trade Dress." (Id. ¶ 21.) Balam identified other products that are also similar to the WATER WARRIORS products, including the "Poolmaster Action Water Pumper," "Space Squirt

13

Guns," "Vintage Space Squirt Gun," "Xtreme Water Blaster 2 pack," and "Water Sports CSG X5 Water Gun." (Id. ¶ 23.)

In his second declaration, Buzz Bee's president, Zimmerman, stated that he was unaware of these infringing products and that he would investigate them and, in the case of FunX toys, instruct his attorneys to file a lawsuit on May 12, 2014, after they finished their reply brief for the present motion. (Zimmerman 2nd Decl. ¶¶ 24-29.)[4] Zimmerman noted that one of the products Balam referenced was being sold by a private buyer on eBay and other products that Balam referenced were available on Chinese websites that are notorious for selling counterfeit goods. (Id. ¶¶ 25-28.)

### 6. Impact of the Alleged Infringement on Plaintiff

Defendant Target represented 15-20% of Buzz Bee's market for the WATER WARRIORS line and Zimmerman speculates that "[i]t is unlikely that Buzz Bee's relationship with Target will ever recover . . . ." (Id. ¶ 53.)

Buzz Bee president Zimmerman asserts that now is the prime season for consumer purchases of waterguns. (Id. ¶ 57.) After July 4th, the majority of water shooting toys will have been sold and by mid-July, retailers will sell water shooters at a discount to clear out inventory. (Id. ¶ 57.) Zimmerman also

---

[4] At oral argument, Plaintiff's counsel represented that the lawsuit against FunX was filed on May 12, 2014.

states that retail buyers will select water shooting toys for the 2015 season between now and July. (Id.) For example, Wal-Mart will choose its waterguns by May 16th. (Id.)

Zimmerman also asserts that, if Swimways continues to sell infringing products, competitors, Chinese manufacturers, and U.S. retail buyers will consider Buzz Bee's trade dress to be "open market," meaning that Buzz Bee's products will be copied with impunity, Buzz Bee will be unable to prevent future and ongoing infringement, Buzz Bee will be unable to regain the goodwill in its products' appearance, and all of Buzz Bee's work will be lost. (Id. ¶ 58.) Zimmerman claims that open copying will diminish Buzz Bee's reputation and goodwill for producing unique, high-quality toys and will cause retailers to choose cheaper knock-offs or products from more established competitors. (Id. ¶ 59.)

**B. Parties' Arguments**

Plaintiff argues that it is likely to succeed on the merits because the packaging, display, and design of its WATER WARRIORS products are unique, distinctive, and have acquired secondary meaning; the precision with which Swimways' products mimic Buzz Bee's products shows that Swimways intentionally copying; the WATER WARRIORS trade dresses are non-functional because the water squirting mechanisms are internal; there is a likelihood of confusion between Buzz Bee's products and Swimways' products

15

because the products' appearances are so similar; the "BUFFDADDY NERF" blog posting evidenced actual confusion between the two product lines; and the products at issue are inexpensive and targeted at children, thus indicating that consumers will not take care to differentiate between the products. Plaintiff also asserts that it will suffer irreparable injury due to losses in trade, reputation, and goodwill and that any injury to Defendants from issuance of the injunction will be inexpensive and the result of forcing Defendants to conduct their business within the law.

In opposition [Docket Item 29], Defendants argue that it did not copy Buzz Bee's WATER WARRIORS products and, instead, picked generic designs from a manufacturer's catalog; many aspects of Buzz Bee's alleged trade dress are functional; confusion is unlikely because the WATER WARRIORS and FLOOD FORCE product lines have different labeling, packaging, marketing materials, and brand names; Buzz Bee has not provided any evidence that its product designs acquired secondary meaning among consumers; other products manufactured by entities that are not parties to this case share many of the WATER WARRIORS products' features; the "BUFFDADDY NERF" blogger was not confused about the two product lines and noted unique features of the Swimways products; Plaintiff has not shown irreparable harm because it did not provide evidence about lost sales, lost

market share, or reputational consequences and has not taken
action to enforce its trade dress rights against other designers
of similar products; and Defendants will suffer irreparable harm
because they will struggle to sell their toys later due to
yearly variations in trends.

In reply [Docket Item 36], Plaintiffs argue that the
overall appearance of the WATER WARRIORS products is not
functional; there is a strong likelihood of post-sale confusion,
particularly when children remove Swimways' products from the
packaging; the presence of Swimways' name on the FLOOD FORCE
products does not obviate the risk of confusion; the speed with
which Swimways produced the FLOOD FORCE line, according to the
Balam declaration, shows that intentional copying occurred;
Plaintiff never abandoned the ARGON and XENON trade dresses and
only stopped using them pursuant to a consent judgment; and
Plaintiff will suffer irreparable harm due to the poor quality
of Swimways' products and the timing of the buying season.

**III. STANDARD OF REVIEW**

To prevail on a motion for preliminary injunctive relief,
the moving party must demonstrate that each of the following
factors favors the requested relief: "(1) the likelihood that
the moving party will succeed on the merits; (2) the extent to
which the moving party will suffer irreparable harm without
injunctive relief; (3) the extent to which the nonmoving party

17

will suffer irreparable harm if the injunction is issued; and
(4) the public interest." <u>McNeil Nutritionals, LLC v. Heartland
Sweeteners, LLC</u>, 511 F.3d 350, 356-57 (3d Cir. 2007) (citation
omitted). A preliminary injunction "is an extraordinary remedy .
. . which should be granted only in limited circumstances." <u>Am.
Tel. & Tel. Co. v. Winback & Conserve Program, Inc.</u>, 42 F.3d
1421, 1427 (3d Cir. 1994) (citation omitted).

**IV. DISCUSSION**

    For the following reasons, although the issues are indeed
close, Plaintiff has not shown that it is likely to succeed on
the merits and has not shown that it is likely to suffer
irreparable harm. Its motion will be denied without prejudice.

    **A. Likelihood of Success on the Merits**

    The Lanham Act, 15 U.S.C. § 1125(a), establishes a cause of
action for trade dress infringement. <u>TrafFix Devices, Inc. v.
Mktg. Displays, Inc.</u>, 532 U.S. 23, 28-29 (2001). "'Trade dress'
refers to the design or packaging of a product which serves to
identify the product's source." <u>Shire US Inc. v. Barr Labs.,
Inc.</u>, 329 F.3d 348, 353 (3d Cir. 2003). It is "the total image
or overall appearance of a product, and includes, but is not
limited to, such features as size, shape, color or color
combinations, texture, graphics . . . ." <u>Rose Art Indus., Inc.
v. Swanson</u>, 235 F.3d 165, 171 (3d Cir. 2000). The purpose of
trade dress protection is to "secure the owner of the trade

dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." _Shire_, 329 F.3d at 353 (internal brackets and citation omitted).

To establish trade dress infringement under the Lanham Act, a plaintiff must prove that "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." _McNeil_, 511 F.3d at 357.[5]

As now discussed, upon the present limited record, Plaintiff has shown non-functionality and likelihood of confusion, but has not shown secondary meaning and, thus, has not established that it is likely to succeed on the merits of this trade dress infringement case.

### 1. Functionality of the Trade Dress

The WATER WARRIORS trade dresses are not functional; Plaintiff has shown a likelihood of success with this element.

The Lanham Act mandates that "[i]n a civil action for trade dress infringement . . . for trade dress not registered . . ., the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). "[A] product feature is

---

[5] "New Jersey statutory and common law of unfair competition require essentially the same elements." _Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd._, 50 F.3d 189, 199 n.10 (3d Cir. 1995).

functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159, 165 (1995) (citation omitted).

Defendants argue that the orange muzzle, transparent reservoir design, and bright external coloration are functional as a matter of law because they are mandated by federal law. Federal Regulations mandate that "[n]o person shall manufacture . . . any toy, look-alike, or imitation firearm . . . unless such device contains . . . one of the markings set forth in § 272.3 . . . ." 15 C.F.R. § 272.2. The approved markings are:

> (a) A blaze orange . . . solid plug permanently affixed to the muzzle end of the barrel . . . .
> (b) A blaze orange . . . . marking permanently affixed to the exterior surface of the barrel . . . .
> (c) Construction . . . entirely of transparent or translucent materials . . . .
> (d) Coloration of the entire exterior surface . . . in white, bright red, bright orange, bright yellow, bright green, bright blue, bright pink, or bright purple, either singly or as the predominant color in combination with other colors in any pattern.

15 C.F.R. § 272.3. These regulations primarily address the coloration or transparency of toy guns; they do not address shape or design.

Defendants also assert that the round nozzle head shape enables the user to rotate between spray settings; the semi-

20

transparent cover of the KWIK GRIP XL reservoir allows the user to see the water level; the ridged pumps and handles improve grip; and the trigger guards prevent accidental firing.

Buzz Bee's president, Zimmerman, asserts that the AVENGER trade dress is non-functional because the water squirting elements are internal mechanisms. He stated that "there is no design or functional need for the nozzle, water reservoir, grips and trigger guards to look like Buzz Bee's WATER WARRIORS Trade Dress in order to function as a water shooter." (Zimmerman 2nd Decl. ¶ 32.) Plaintiff provided pictures showing, <u>inter alia</u>, waterguns that are available for sale next to Swimways' products and that look nothing like Swimways' or Buzz Bee's products, despite having orange muzzles and ridges. [Docket Item 38-5.]

Plaintiff has shown a likelihood of success on this element. Defendants' arguments about coloration, ridges, and trigger guards do not encompass the overall appearance of the WATER WARRIORS products, which is what Plaintiff seeks to protect. Plaintiff's trade dresses involve, <u>inter alia</u>, wave-like arcuate design, futuristic coil designs, and futuristic bubble projections. These design elements are not functional or federally-mandated. Furthermore, "one may have a protectible interest in a combination of features or elements that includes one or more functional features. . . . Indeed, virtually every product is a combination of functional and non-functional

21

features and a rule denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement." Am. Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1143 (3d Cir. 1986) (citations omitted).

A watergun can incorporate federally-mandated and functional elements without aping Plaintiff's trade dresses. Plaintiff is likely to succeed on the non-functionality prong.

### 2. Secondary Meaning

Upon the present record, Plaintiff has not demonstrated a likelihood of showing that its trade dresses have acquired secondary meaning.

Trade dress can be distinctive in one of two ways: "First, [it] is inherently distinctive if [its] intrinsic nature serves to identify a particular source. . . . Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning . . . ." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210-11 (2000) (citations omitted). Secondary meaning "occurs when, in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself." Id. at 211; see also Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 82 (3d Cir. 1982) ("When the primary significance of the trade dress to a consumer is in

22

designating not the product but its producer, the trade dress has acquired secondary meaning").

In the present case, the Court will focus on the secondary meaning element because "[i]n an action for infringement of unregistered trade dress . . ., a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." Wal-Mart, 529 U.S. at 216. The Wal-Mart court held that product design "is not inherently distinctive" and that "the producer can ordinarily obtain protection for a design that is inherently source identifying (if any such exists), but that does not yet have secondary meaning, by securing a design patent or a copyright . . . ." Id. at 212, 214 (emphasis in original). Furthermore, the Wal-Mart court instructed that, when there are arguments about both product-design and product-packaging trade dress, "[t]o the extent there are close cases, . . . courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." Id. at 215.

Plaintiff argues that "[t]he packaging and display of Buzz Bee's WATER WARRIORS Line is unique in the relevant field, and therefore inherently distinctive." (Pl. mot. at 21.) However, the WATER WARRIORS trade dresses that Plaintiff described, transcribed supra, all involve design features of the waterguns themselves, not the packaging in which they appear. Furthermore

23

Plaintiff's president Zimmerman stated that "the packaging for
these products is not significant to customers. . . . the
packaging is there to display the products. When sold online,
these types of water shooting toy products are almost invariably
shown without the packaging." (Zimmerman 2nd Decl. ¶¶ 44-46.)
Finally, Plaintiff emphasized the likelihood of post-sale
confusion once children play with the products, which also
indicates that the trade dresses of the products themselves, not
the packaging, are primarily at issue here. Essentially,
Plaintiff is alleging that Defendants copied its product
designs, which are visible through the packaging in stores.
Furthermore, even if this case were "close," Wal-Mart holds that
"close cases" should be treated as product design cases. The
Court will therefore focus on secondary meaning.

        With regard to the packaging itself, and focusing upon the
Plaintiffs' two toys that remain at issue – the KWIK DRIP XL and
the AVENGER – the evidence at the hearing included the packaging
of these items, Exs. 9 and 11, respectively. When the packaging
of the KWIK GRIP XL is compared with the STRYKER packaging (Ex.
10), there are indeed similarities in the arrangement of the
products, the words "Blasts up to 25 ft.," and the photos of
young boys using the toys. Like the STRYKER's near congruence to
the design of the KWIK GRIP XL, the packaging is not dissimilar;
but the models are prominently named and differentiated in the

largest printing on these packages, and the producers – Buzz Bee toys and Swimways – are likewise displayed and differentiated. But there is nothing unique about the Plaintiff's packaging of the KWIK GRIP XL, as most watergun toys of various brands display the same sort of information on their package, including an illustration of a child playing with the toy and specifications about how far the toy can stream water. These are not protectable elements of Plaintiff's packaging. The comparison between the AVENGER packaging (Ex. 11) and the STORM counterpart is even less similar, with the STORM being displayed horizontally and semi-enclosed in cardboard while the AVENGER is displayed vertically and unenclosed. In short, the trade dress of the packaging for the KWIK GRIP XL and the AVENGER do not create the impression of a unified product line nor are they distinctive. Again, the case will be examined as a product trade dress case rather than a packaging case.

The Third Circuit has listed "non-exclusive" factors which may be considered in evaluating secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000). An analysis of these factors

shows that Plaintiff has not shown a likelihood of success in establishing secondary meaning.

### i. Extent of Sales and Advertising Leading to Buyer Association

This factor does not weigh in Plaintiff's favor. Plaintiff notes that retailers who sell its products feature Buzz Bee's products in their print advertising, which is worth $500,000.00 per year, and that retailer customers, such as Target and Wal-Mart, also advertise Buzz Bee's toys on their websites. Plaintiff also notes its successful sales figures.[6]

This factor does not simply examine whether a product has been advertised or sold successfully; it examines whether the advertising and sales have led to buyer association with the source and Plaintiff has not shown buyer association with a source or brand. "To be probative of secondary meaning, the advertising must direct the consumer to those features claimed as trade dress." Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 44 (1st Cir. 2001). Essentially, there is no secondary meaning because there is a "lack of evidence as to advertising of the specific trade dress claimed, as well as the lack of evidence demonstrating a conscious connection by the

---

[6] Since 2007, 102,684 AVENGER units have been sold and sales totaled $206,352.00. KWIK GRIP XL toys are usually sold in three- or four-packs, and 2,033,223 KWIK GRIP XL units have been sold with total sales of $4,197,858.00. Over 368,000 ARGON units have been sold, and sales total $1,584,000.00. At least 238,000 XENON units have been sold, and sales total $1,561,000.00.

public between the claimed trade dress and the product's source
. . . Proof of secondary meaning requires at least <u>some</u> evidence
that consumers associate the trade dress with the source." <u>Id.</u>
(emphasis in original).

Buzz Bee's president Zimmerman claims that both consumers
and the trade associate the AVENGER trade dress with Buzz Bee as
the source. This statement is not probative of buyer
association. Declarations from a plaintiff's employees have
"little probative value regarding the assessment of consumer
perception" because "[t]rademark law is skeptical of the ability
of an associate of a trademark holder to transcend personal
biases to give an impartial account of the value of the holder's
mark" and because "[a]ttestations from person in close
association and intimate contact with the trademark claimant's
business do not reflect the views of the purchasing public."
<u>Self-Realization Fellowship Church v. Ananda Church of Self-
Realization</u>, 59 F.3d 902, 910 (9th Cir. 1995) (citation,
parentheses, and quotation marks omitted).

Plaintiff also notes that buyers need not associate the
products with a named source and can associate the products with
an anonymous source. Plaintiff is correct that consumers need
not identify Buzz Bee as the corporate producer, but there must
be some association with the source of a particular product or
brand. "Secondary meaning does not require proof that consumers

know the name of the company that owns the trademark. It requires only that customers associate the word or symbol with a single, albeit anonymous, commercial source." 2 McCarthy on Trademarks and Unfair Competition § 15:1 (4th ed.). The standard "does not mean that the buyer knows the identity of that 'single source' in the sense that he knows the corporate name of the producer or seller. In fact, few buyers know, or care about, the corporate identity of the seller of a trademarked product." Id. § 15:8 (emphasis in original). McCarthy uses the example of a particular type of whiskey:

> Of course there may not be one in a hundred buyers who knows that it is made by Buchanan or wholesaled by Fleischmann. Probably all that such buyers know is that BLACK & WHITE Scotch whiskey has satisfied them in the past or that they have heard of it and the average purchaser would no doubt select for the use of his guests something with which he was familiar and thus purchase BLACK & WHITE Whiskey.

Id. (citing Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 155 (9th Cir. 1963)). In other words, a consumer need not identify Buzz Bee as the manufacturer, but there must be some identification with a particular brand, such as WATER WARRIORS or KWIK GRIP XL or BLACK & WHITE Whiskey. See also A.J. Canfield Co. v. Honickman, 808 F.2d 291, 301 (3d Cir. 1986) ("the primary significance test is generally satisfied if a term signifies a product that emanates from a single source, i.e., a product brand . . ."). Even if consumers do not know the WATER

WARRIORS brand or the individual product names, Plaintiff also has not shown that consumers recognize Plaintiff's trade dresses or associate them with a single source.

Plaintiff has not shown that its sales and advertising have led consumers to associate their preferred waterguns with WATER WARRIORS, KWIK GRIP XL, AVENGER, ARGON, or XENON.

### ii. Length of Use and Exclusivity of Use

The AVENGER trade dress has been used since 2007; the KWIK GRIP XL trade dress has been used since 2003; and the XENON and ARGON trade dresses were used from 2004 to 2009, until production ceased due to a consent judgment in patent litigation, and will be re-launched in 2015. Plaintiff argues that its use has been exclusive and that, since all of the trade dresses were used for at least five years, the length of use shows secondary meaning.

Defendant argues that Plaintiff's non-use of the XENON and ARGON trade dresses constitutes abandonment; that five years is insufficient; and that Plaintiff's use has not been exclusive.

Under the Lanham Act, "[a] mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. . . . Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. To show abandonment, "it is necessary to show not only acts indicating a practical abandonment, but an actual intent to

29

abandon . . . ." Marshak v. Treadwell, 240 F.3d 184, 198 (3d
Cir. 2001) (citation omitted). Given that Plaintiff stopped
using the ARGON and XENON marks because of a consent judgment
and that Plaintiff intends to re-launch those products, there
was no abandonment. On the other hand, as explained above, the
lack of any sales of ARGON and XENON products for five years
militates against any current consumer identification with these
models.

Plaintiff notes that, in the trademark context, when
considering registration of a trademark, "[t]he Director may
accept as prima facie evidence that the mark has become
distinctive, . . . proof of substantially exclusive and
continuous use thereof as a mark by the applicant in commerce
for the five years before the date on which the claim of
distinctiveness is made." 15 U.S.C. § 1052(f). The Court does
not find this fact persuasive because the Third Circuit has
noted that "the law of trade dress in product configurations
will differ in key respects from the law of trademarks or of
trade dress in product packaging . . . ." Versa Products Co.,
Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 202 (3d Cir. 1995).
In a trade dress case regarding the appearance of plastic
planters, the Third Circuit noted "five years, not so long a
time as to raise a strong inference of consumer association with
a single source." Duraco Products, Inc. v. Joy Plastic

Enterprises, Ltd., 40 F.3d 1431, 1454 (3d Cir. 1994). The Court therefore holds that Plaintiff's years of use, standing alone, do not establish a strong inference of consumer association with a single source. The years-of-use factor may be somewhat more probative in relation to the KWIK GRIP XL, which has been used since 2003.

Defendant found examples of non-exclusivity of use. Some of those examples arose from counterfeit websites in China or a private individual seller on the eBay website. Plaintiff attested that it was unaware that FunX Toys was producing the Stealth Drencher F4, which appears to copy the KWIK GRIP XL, and Plaintiff now plans to sue FunX Toys. While Plaintiff shows intent to legally enforce its exclusivity, it appears, at this time, that its trade dresses are being copied elsewhere.

In sum, there has not been abandonment; the length of use does not create a strong inference of consumer association; and, at this stage, Plaintiff has not shown exclusivity. This factor is equivocal for the KWIK GRIP XL, weak for the AVENGER, and absent for the XENON and ARGON lines.

### iii.  Fact of Copying

This factor weighs in Plaintiff's favor. From the Court's perspective, Swimways' STORM (Ex. 4) looks essentially identical to Buzz Bee's AVENGER (Ex. 3); Swimways' STRYKER three-pack (Ex. 10) looks quite similar to Buzz Bee's KWIK GRIP XL three-pack

(Ex. 9); Swimways' TSUNAMI (Ex. 8) looks very similar to Buzz
Bee's ARGON (Ex. 7); and Swimways' AVALANCHE (Ex. 6) looks very
similar to Buzz Bee's XENON (Ex. 5). The Court examined the
products in evidence at the hearing. The strongest showing of a
nearly congruent copy exists between Plaintiff's KWIK GRIP XL
(Ex. 1) and Swimways' STRYKER (Ex. 2). Other than the colors and
the appearance of the trigger, the many fanciful embellishments
of the KWIK GRIP XL are repeated in the STRYKER. The "BUFFYDADDY
NERF" blogger said that Swimways' AVALANCE was "[a] close copy
of the Water Warriors Xenon," Swimways' TSUNAMI was "[a] copy of
the Water Warriors Argon," Swimways' STRYKER units were
"[r]eshells of one of the original Water Warriors Kwik Grips
XL," and "there was also a piston blaster virtually identical to
the Water Warriors Avenger." (Zimmerman 1st Decl. Ex. Z at 3-4.)
There are small differences between the products, but the
overall similarity of the product lines is unmistakeable.

"Evidence of intentional copying . . . strongly supports an
inference of secondary meaning, but courts have emphasized that
it is one of many considerations, and does not alone establish
secondary meaning." Am. Beverage Corp. v. Diageo N. Am., Inc.,
936 F. Supp. 2d 555, 602 (W.D. Pa. 2013) (citations omitted).
Particularly in product design cases, "attempts to copy a
product configuration will quite often not be probative: the
copier may very well be exploiting a particularly desirable

32

feature, rather than seeking to confuse consumers as to the source of the product." Duraco Products, 40 F.3d at 1453 (upholding denial of preliminary injunction, despite evidence of intentional copying, because, inter alia, there was no secondary meaning).

The WATER WARRIORS and FLOOD FORCE product lines are undeniably similar but intentional copying does not alone establish secondary meaning because "the relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another." Yankee Candle Co., 259 F.3d at 45. Plaintiff has not shown that Swimways' products are "passing off" as Buzz Bee's products.

The fact-of-copying factor weighs in Plaintiff's favor, but it is not dispositive, particularly because this is a product configuration case.

### iv.   Customer Surveys and Testimony

Plaintiff has not presented any evidence of customer surveys or testimony. According to Zimmerman's declaration, Plaintiff did not learn of Defendants' alleged infringement until February 7, 2014 and Plaintiff's counsel represented to the Court during the telephonic scheduling conference that, before filing the lawsuit, Plaintiff attempted to negotiate with Defendants. Given the condensed time frame, it is not surprising that Plaintiff has not had time to conduct surveys or collect

33

testimony. The Third Circuit has "never" held "that a party seeking to establish secondary meaning must submit a survey on that point." E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 201 (3d Cir. 2008). The absence of this evidence is, however, problematic given the paucity of other evidence indicating that consumers recognize Buzz Bee's products, the WATER WARRIORS brand, or the individual products within the product line. Perhaps as pretrial discovery progresses, Plaintiff will amass customer testimony or survey evidence that sheds light upon customer recognition of Buzz Bee's products or confusion as to the source of Swimways' products. Presently, this lack of customer evidence cuts against Plaintiff.

<strong>v.  Use of the Trade Dress in Trade Journals</strong>

There has been no trade journal evidence, although Plaintiff notes that the WATER WARRIOR toys appear regularly on independent fan and industry news sites like buffdaddynerf.com, isoaker.com, sscentral.org, and waterwar.net. In the context of this motion, the Court accepts those sites as relevant under this factor. Plaintiff has not provided any evidence of the context in which these toys appeared on the sites, whether the trade dresses were featured, and whether the coverage would lead to an association with the brand or the source. Based on the evidence that is presently before the Court, this factor is neutral; it neither favors nor disfavors Plaintiff.

34

### vi.  Company Size

Buzz Bee has less than 50 employees. The parties did not discuss this factor's import, and it will not be considered.

### vii.  Sales Numbers

Plaintiff has described successful sales figures, recounted supra, and a 35% share of the relevant market, but "[s]ales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features." Duraco, 40 F.3d at 1452. The Duraco court explained that product configuration "differs dramatically from trademark and from product packaging, since the success of a particular product—especially if similar competing products exist—does not readily lead to the inference of source identification and consumer interest in the source; it may well be that the product, inclusive of the product configuration, is itself inherently desirable . . . ." Id. at 1453.

The Duraco case is similar to this case because it involved an inexpensive product, i.e., a plastic planter that cost less than $5.00; the product was available at a large retail chain, i.e., K-Mart; the advertising was conducted cooperatively with

35

retailers, primarily through, <u>inter alia</u>, circulars, newspaper fliers, and newspaper advertisements; the plaintiff asserted that the planters' success was attributable to "a careful combination of ornamental features"; and, as in this case, the defendant's products were "strikingly similar in appearance" to the plaintiff's products. <u>Id.</u> at 1434-35. The <u>Duraco</u> court noted that the plaintiff "ha[d] not shown any consumer association between the Grecian Classics planters and a particular source; instead its plastic planters are purchased because consumers (whether retail or wholesale) find them innately desirable . . . ." <u>Id.</u> at 1453. Essentially, the <u>Duraco</u> plaintiff's sales success, without other evidence of consumer association, did not establish secondary meaning.[7]

Because this is a product design case and because Plaintiff has not shown that its sales success is attributable to brand or source identification, this factor weakly supports Plaintiff.

---

[7] At oral argument, Plaintiff asserted that the <u>Duraco</u> case was inapposite because the planter at issue was a generic product. A plaintiff asserting trade dress infringement must show either inherent distinctiveness or acquired secondary meaning. The <u>Duraco</u> court created a test for inherent distinctiveness and found that the planter at issue did not satisfy the test. It then examined whether, in lieu of inherent distinctiveness, the plaintiff had shown secondary meaning and held that it had not. The inherent distinctiveness test that the Third Circuit applied is not relevant here because this is a product design case and, after <u>Wal-Mart v. Sumara</u>, discussed <u>supra</u>, the plaintiff in a product design test must show secondary meaning.

### viii.   Number of Customers

None of the parties discussed the import of this factor, and the Court will not consider it.

### ix.   Actual Confusion

Plaintiff has not produced any evidence of actual confusion. Plaintiff cites the "BUFFDADDY NERF" blogger, who noted that Swimways' products were copies of Buzz Bee's products. But the blogger was not actually confused about whose products were manufactured by whom and he did not mistakenly assert that Swimways' products were manufactured or designed by Plaintiff. This factor does not favor Plaintiff. Perhaps pretrial discovery will reveal whether retailers or consumers have been confused about the source of Swimways' products. There is little or no prospect of any actual confusion regarding the TSUNAMI and AVALANCHE toys, since Plaintiff's counterpart models (ARGON and XENON) have not been sold for five years while Swimways' products are new to the market.

### x.   Summary of Secondary Meaning Factors

Some of the factors, including the fact of copying, sales success, and the length of use of the KWIK GRIP XL trade dress, weigh in Plaintiff's favor. These factors do not support a secondary meaning finding because this is a product configuration case in which the fact of copying and sales success are not dispositive. Plaintiff has not shown that

37

consumers identify the WATER WARRIORS brand or that, in consumers' minds, the primary significance of the trade dresses is to identify the products' source or brand.

In *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78 (3d Cir. 1982), the Third Circuit evaluated whether the district court properly granted a preliminary injunction against defendant Plawner, which produced a "Wonderful Puzzler" identical to the "Rubik's Cube" puzzle that plaintiff Ideal produced pursuant to an exclusive arrangement with inventor Erno Rubik. The Third Circuit held that the plaintiff had established secondary meaning because there was copying, plaintiff Ideal had invested $2,000,000.00 in advertising and sold over 5,000,000 units in one year, consumer survey data showed that 40 percent of respondents mistakenly identified the defendant's imitation as a Rubik's cube, and unauthorized Rubik's Cube imitations were mistakenly returned to plaintiff Ideal for repair. Furthermore, defendant Plawner's attorney conceded at the hearing that consumer confusion was likely:

> THE COURT: If someone went into a store and said to the store owner, "give me Rubik's Cube," and they handed them the defendant's product, is there any question in your mind that the customer would think that he was getting what he asked for?
>
> COUNSEL FOR PLAWNER: No question in my mind.

*Id.* at 82. The *Ideal Toy* case highlights Plaintiff's ultimate burden, namely to show whether the trade dresses identify the

38

source of the product, rather than the product itself. See also
Duraco, 40 F.3d at 1441 (preliminary injunction not proper in
trade dress infringement case involving plastic planters because
"we think it quite improbable that a consumer upon seeing
[defendant]'s plastic planter in a store would reasonably
associate its specific configuration with a particular source,
even if the consumer had repeatedly before seen [plaintiff's]
plastic planter") (emphasis in original).

In other words, Plaintiff has not adduced any evidence
indicating that a customer would go to Target, ask for Buzz Bee
or WATER WARRIORS products, and leave with a Swimways FLOOD
FORCE product mistakenly believing that the watergun was a Buzz
Bee or WATER WARRIORS product. Instead, it appears that a
customer would go to Target, ask for a watergun, and leave with
Defendant Swimways' products simply because Swimways' products
were available.

Plaintiff has not shown secondary meaning and, thus, has
not shown a likelihood of success on the merits.

### 3. Likelihood of Confusion

AS to this third prong of the product trade dress
infringement cause of action, Plaintiff has shown that consumers
are likely to confuse Swimways' trade dress with Buzz Bee's
trade dress.

"A likelihood of confusion exists when consumers viewing the defendant's trade dress probably would assume that the product it represents is associated with the source of a different product identified by the plaintiff's similar trade dress." McNeil, 511 F.3d at 357. In other words, "a plaintiff may prevail in a trade dress infringement action only if it shows that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as to the source of the goods." Versa, 50 F.3d at 200. "Competitors have broad rights to copy successful product designs when those designs are not protected by (utility or design) patents. It is not unfair competition for someone to trade off the good will of a product; it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior producer." Id. at 207 (citation omitted) (emphasis in original). However, "proof of actual confusion is not required for a successful trade dress infringement action under the Lanham Act." Id. at 205.

To determine whether there is a likelihood of confusion, the Court must employ the factors announced in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983), which are:

> (1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress;
> (2) the strength of the plaintiff's trade dress;

> (3) the price of the goods and other factors
> indicative of the care and attention expected of
> consumers when making a purchase;
> (4) the length of time the defendant has used its
> trade dress without evidence of actual confusion
> arising;
> (5) the intent of the defendant in adopting its trade
> dress;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are
> marketed through the same channels of trade and
> advertised through the same media;
> (8) the extent to which the targets of the parties'
> sales efforts are the same;
> (9) the relationship of the goods in the minds of
> consumers because of the similarity of function;
> (10) other facts suggesting that the consuming public
> might expect the plaintiff to manufacture a product in
> the defendant's market, or that the plaintiff is
> likely to expand into that market.

McNeil, 511 F.3d at 358. "[T]he Lapp test is a qualitative
inquiry. Not all factors will be relevant in all cases; further,
the different factors may properly be accorded different weights
depending on the particular factual setting." A & H Sportswear,
Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 215 (3d
Cir. 2000).

Defendant cites Versa, 50 F.3d at 203, for the proposition
that "in trade dress infringement suits where the dress inheres
in a product configuration, the primary factors to be considered
in assessing likelihood of confusion are the product's labeling,
packaging, and advertisements." The Versa court explained that
"except where consumers ordinarily exercise virtually no care in
selecting a particular type of product (as may be the case with

inexpensive disposable or consumable items . . .), clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." Id. Versa was an industrial design case involving a "directional control valve . . . used in control panels of offshore oil-drilling rigs to facilitate emergency shutdowns." Id. at 193. As discussed further infra, the present case involves inexpensive toys for children, and the Versa court specifically noted that directional control valves "are not bought by children or casual consumers . . . ." Id. at 214. Therefore, while the Court is mindful of the Versa court's emphasis on clarity of labeling in packaging and advertising, the Court will assess all the Lapp factors because this is not an industrial design case, the appearance of the waterguns is likely much more important to consumers than the appearance of the Versa valves, and the target audience is casual consumers.

The WATER WARRIORS and FLOOD FORCE product lines are remarkably similar and casual consumers are unlikely to distinguish between them.

### i.  Degree of Similarity (Lapp Factor 1)

"[T]he single most important factor in determining likelihood of confusion is trade dress similarity. The proper test is not side-by-side comparison but whether the trade

dresses create the same overall impression when viewed separately." McNeil, 511 F.3d at 359 (brackets and citations removed).

As discussed supra, the products look very similar and, particularly when considering the similarity between each offering in the WATER WARRIORS and FLOOD FORCE product lines, this factor strongly weighs in Plaintiff's favor. Defendant notes that the "BUFFDADDY NERF" blogger noted that Swimways' toys "appear to have either pinch triggers, or some sort of alternative valve mechanism . . . ." (Id. at 3.) The different triggers and valve mechanisms do not diminish the high degree of similarity between Buzz Bee's WATER WARRIORS and Swimways' FLOOD FORCE product lines, particularly because the "BUFFDADDY NERF" blogger is likely more sophisticated than the average consumer.

Defendant argues that "[t]he presence of [the source's] name on the product goes far to eliminate confusion of origin" because "there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed." Bose Corp. v. Linear Design Labs, Inc., 467 F.2d 304, 309-310 (2d Cir. 1972). Swimways' FLOOD FORCE products have the STRYKER, STORM, AVALANCHE, and TSUNAMI names and bear the Swimways name and logo on each product. On Buzz Bee's KWIK GRIP XL (Ex. 1), however, the Buzz Bee name is almost invisible; only by close examination and holding the product in a certain way toward the

43

light can one even detect that it is a Buzz Bee product, and it contains no logo. In contrast, the STRYKER (Ex. 2) contains the imprinted Swimways name and logo in a highly legible relief. But consumers of these inexpensive children's toys are unlikely to pay close attention to labels, unlike the consumers of the high fidelity speakers in the <u>Bose</u> case or the directional control valves in <u>Versa</u>.

Because the products appear so similar, this factor weighs in Plaintiff's favor, at least for the Plaintiff's KWIK GRIP XL and AVENGER models currently on sale.

### ii.  Strength of Plaintiff's Trade Dress (<u>Lapp</u> Factor 2)

"'[S]trength' of product configuration as relevant to determining likelihood of confusion on the part of ordinarily careful consumers should be found only if consumers <u>rely</u> on the product's configuration to identify the producer of the good. This may perhaps be the case with products purchased largely <u>because of</u> their appearance, such as 'Carebears' . . . ." <u>Versa</u>, 50 F.3d at 203-04 (citing <u>Am. Greetings Corp. v. Dan-Dee Imports</u>, 807 F.2d at 1138, which addressed trade dress infringement of Carebears stuffed animals) (emphasis in original). There is no evidence in the record as to whether consumers purchase Buzz Bee's or Swimways' waterguns because their appearance identifies the source or whether the purchase

44

is motivated by other factors, such as pleasing design, price, or convenient availability at a frequently-visited store. Plaintiff emphasized that the consumers are small children who may not know about producers or brands, but Plaintiff has not adduced any evidence to show that young children lack brand knowledge. This factor is neutral.

### iii.   Price of Goods And Other Factors Indicating Consumers' Care And Attention (<u>Lapp</u> Factor 3)

The third <u>Lapp</u> factor considers the price of the goods and other factors indicative of the care and attention expected of ordinary consumers when making a purchase. "The greater the care and attention, the less the likelihood of confusion." <u>Fisons Horticulture, Inc. v. Vigoro Indus., Inc.</u>, 30 F.3d 466, 476 n.12 (3d Cir. 1994). "[T]his factor takes on enhanced importance when a claim is made for infringement of trade dress in a product configuration . . . ." <u>Versa</u>, 50 F.3d at 204.

These products range in price from a low of $2.49 to a high of $14.99. They are inexpensive products and, thus, unlikely to demand the care and attention that consumers devote to more expensive products. "Inexpensive goods require consumers to exercise less care in their selection than expensive ones." <u>Id.</u>

The declarants, <u>i.e.</u>, Swimways' vice-president Balam and Buzz Bee's president Zimmerman, dispute whether children purchase the products, whether parents purchase the products, or

45

whether parents purchase the products under the strong influence
of their children. The Court need not resolve this factual
dispute now. The fundamental point is that the consumers
(whether parents or children) are unlikely to be sophisticated.
Furthermore, the fact that some purchasers are retail stores'
professional buyers does not change the analysis: "Where the
buyer class consists of both professional buyers and consumers
then the issue will center on the consumers, for confusion
within the lowest stratum of 'reasonably prudent buyers' may
give rise to liability even if professional buyers in the market
are not confused." Ford Motor Co. v. Summit Motor Products,
Inc., 930 F.2d 277, 293 (3d Cir. 1991). Essentially, "when a
buyer class is mixed, the standard of care to be exercised by
the reasonably prudent purchaser will be equal to that of the
least sophisticated consumer in the class." Id. Because the
buying class in this case involves both professional retail
buyers, parents, and children, the Court will apply a low
standard of care. This factor therefore weighs in Plaintiff's
favor because, given the inexpensive price and the young target
audience, consumers are not likely to exercise substantial care
and attention in making their product decisions.

Plaintiff emphasizes the possibility of post-sale
confusion. Courts "may consider . . . post-sale confusion when
evaluating Lapp factor (3)." Acxiom Corp. v. Axiom, Inc., 27 F.

Supp. 2d 478, 497 (D. Del. 1998).[8] While it seems possible that consumers may be confused post-sale about the product's source, Plaintiff has not given any indication that such confusion is occurring. For example, Plaintiff has not indicated that it has received any customer complaints about or returns of Swimways' products or that consumers are aware of its brand. Lapp factor three already weighs in Plaintiff's favor, and the Court need not consider the impact of post-sale confusion at this time.

### iv.   Length of Time the Defendant Has Used Its Trade Dress Without Evidence Of Actual Confusion Arising (Lapp Factor 4)

This factor cannot be assessed because there has been no evidence of actual confusion and because Swimways' FLOOD FORCE line only began production after July 2013.

### v.   Defendant's Intent in Adopting Its Trade Dress (Lapp Factor 5)

In the trademark context, Defendant's intent is significant because "evidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion." Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc., 269 F.3d

---

[8] Post-sale confusion occurs when, for example, "'a consumer observes someone wearing a pair of Payless accused shoes and believes that the shoes are Reebok's. As a consequence, the consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image.'" Gucci Am., Inc. v. Daffy's Inc., 354 F.3d 228, 234 (3d Cir. 2003) (quoting Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 989 (Fed. Cir. 1993)).

270, 286 (3d Cir. 2001) (quotation omitted). "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 721 (3d Cir. 2004).

Defendants argue that Swimways' intent is irrelevant and cite Versa, for the proposition that "in the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading."[9] Versa, 50 F.3d at 208.

This case is neither a trademark case, nor an industrial design case like Versa. Plaintiff has not shown that the FLOOD FORCE products are misleadingly labeled and marketed. In fact, there has been no evidence at all about marketing of the FLOOD FORCE line. However, even if Swimways' intent is irrelevant, the Court must also consider Target's intent. The intent factor weighs in Plaintiff's favor because of the obvious similarity between the two product lines and because of the facts that Buzz Bee produced these products first, Buzz Bee sold them at Target before Swimways, both product lines were present at the line

---

[9] The Versa court evaluated a permanent injunction issued after a bench trial. Because discovery and trial have not occurred yet here, the Court will not require clear and convincing evidence.

review in 2013, and the Target buyer was surely aware of the similarity between the lines.

### vi.   Evidence of Actual Confusion (<u>Lapp</u> Factor 6)

Plaintiff has not produced any evidence of actual confusion. Plaintiff cites the "BUFFDADDY NERF" blogger, who noted that Swimways' products were copies of Buzz Bee's products. But the blogger was not actually confused about whose products were manufactured by whom and he did not mistakenly assert that Swimways' products were manufactured or designed by Plaintiff.[10] This factor does not weigh in Plaintiff's favor.

### vii.   Whether the Goods Are Marketed Through The Same Channels Of Trade And Media (<u>Lapp</u> Factor 7)

"[T]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. Applying this factor, courts must examine the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." <u>Checkpoint</u>, 269 F.3d at 288-89 (citation omitted). Plaintiff apparently does no advertising of its WATER WARRIORS line to the public. There

---

[10] Furthermore, even if the blogger had been confused, "statements on message boards on the internet do not alone create a substantial likelihood of success on the merits of a likelihood of confusion." <u>Katiroll Co., Inc. v. Kati Roll & Platters Inc.</u>, Civ. 10-3620 (GEB), 2011 WL 346502, at *6 (D.N.J. Feb. 1, 2011).

has been little evidence about the marketing campaigns of either
the WATER WARRIORS or FLOOD FORCE product lines.

> **viii.   Extent to Which Targets of the Parties' Sales
> Efforts Are the Same (<u>Lapp</u> Factor 8)**

This factor weighs in Plaintiff's favor. The target
audiences are the same because both Plaintiff's WATER WARRIORS
product line and Swimways' FLOOD FORCE product line target
children aged 4-12.

> **ix.   Relationship of the Goods in the Minds Of
> Consumers Because of the Similarity of Function
> (<u>Lapp</u> Factor 9) and Other Facts Suggesting That
> the Consuming Public Might Expect the Plaintiff
> to Manufacture A Product In The Defendant's
> Market, Or That The Plaintiff Is Likely To
> Expand Into That Market (<u>Lapp</u> Factor 10)**

In addressing the ninth and tenth factors, <u>i.e.</u>, similarity
of function and other facts suggesting consumers' expectations
regarding market overlap, the Third Circuit held that "[b]earing
in mind that these factors also were developed for non-competing
products, we believe that they are largely superfluous in
product configuration cases. The requisite similarity of trade
dress <u>in the product designs themselves</u> would in most cases
presuppose a similarity of function between the products at
issue." <u>Versa</u>, 50 F.3d at 208 (emphasis in original).

> **x.   Summary of <u>Lapp</u> factor analysis**

Four of the <u>Lapp</u> factors clearly weigh in Plaintiff's
favor: the degree of similarity (<u>Lapp</u> factor 1), the products'
inexpensive prices (<u>Lapp</u> factor 3), Defendant's intent (<u>Lapp</u>

factor 5), and the target audience (Lapp factor 8). Except for evidence of actual confusion (Lapp factor 6), which does not favor Plaintiff, the remaining factors are either irrelevant or cannot be assessed at this time. The Court therefore concludes that Plaintiff has shown a likelihood of success on the element of likelihood of confusion. These products are remarkably similar and create the same overall impression.[11]

In sum, while Plaintiff has shown the likelihood of proving that its trade dresses are non-functional and that there is a likelihood of confusion between Buzz Bee's and Swimways' product trade dresses, Plaintiff has not shown a likely ability to prove secondary meaning and, therefore, has not shown a likelihood of success on the merits.

**B. Irreparable Harm**

Aside from Plaintiff's failure to show the likelihood of success on the merits, Plaintiff's motion for injunctive relief will also be denied because Plaintiff has not shown that it is likely to suffer irreparable harm.

---

[11] The Court is mindful that "[t]he dispositive issue is the possibility of consumer confusion as to source. . . ." Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 151 (3d Cir. 1984). While the Plaintiff has shown that consumers might perceive the Swimways and Buzz Bee products as being the same, Plaintiff has not shown that consumers are likely to be confused as to the source of the products because there is no evidence that consumers consider, care about, or a seek a particular manufacturer or brand of the waterguns at issue in this case. In this case, however, the question of source awareness is best addressed in the secondary meaning analysis.

The Third Circuit has "repeatedly insisted that the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm." Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 557 (3d Cir. 2009) (citation omitted). In addition, the Third Circuit has "long held that an injury measured in solely monetary terms cannot constitute irreparable harm." Id. "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Kos Pharm., 369 F.3d at 726 (quotation omitted).

Furthermore, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987); see also Warner Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 399 (D.N.J. 1989) ("In considering any motion for preliminary injunctive relief, a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it.")

### 1. Irreparable Harm Must Be Independently Established

Plaintiff argues that "trademark infringement amounts to irreparable injury as a matter of law." (Pl. mot at 35.) In support of this proposition, Plaintiff cites Opticians Ass'n of

<u>Am. v. Indep. Opticians of Am.</u>, 920 F.2d 187, 196 (3d Cir. 1990), in which the Third Circuit held that "[t]here is no doubt that the [defendant]'s infringement has inhibited the [plaintiff]'s ability to control its own . . . marks, which in turn creates the <u>potential</u> for damage to its reputation. Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." The <u>Opticians</u> court concluded that "where the plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course." <u>Id.</u>

Supreme Court jurisprudence subsequent to <u>Opticians</u>, however, has emphasized that that a plaintiff must establish all four elements of the preliminary injunction test, including the irreparable harm element, and that irreparable harm must be likely, not merely possible. In <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388 (2006), the Supreme Court held that the traditional four-factor injunction test under equity law applies to cases arising under the Patent Act and rejected the appeals court's holding that injunctions should automatically issue once infringement and validity have been adjudged. The Supreme Court referenced its Copyright Act jurisprudence and emphasized that it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been

53

infringed." Id. at 392-93. The eBay court held "that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id. at 394.

The Lanham Act, under which Plaintiff's trade dress infringement claims arise, provides that courts "shall have power to grant injunctions, according to the principles of equity . . . ." 15 U.S.C. § 1116(a). The Court must follow the eBay court's admonishment that all four equity factors must be established when granting equitable relief.

Although the Third Circuit has not yet examined this issue, other circuit courts and district courts in this circuit have held that, after eBay, irreparable harm must be established as a separate element, regardless of whether a plaintiff has shown infringement. See, e.g., Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 1239, 1249 (9th Cir. 2013) ("We now join other circuits in holding that the eBay principle—that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case"); Salinger v. Colting, 607 F.3d 68, 77-78 (2d Cir. 2010) ("nothing in the text or the logic of eBay suggests that its rule is limited to patent cases. On the contrary, eBay strongly

indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context"); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008) (in trademark infringement and false advertising case, "[b]ecause the language of the Lanham Act— granting federal courts the power to grant injunctions 'according to the principles of equity and upon such terms as the court may deem reasonable'—is so similar to the language of the Patent Act, we conclude that the Supreme Court's eBay case is applicable"); King Pharm., Inc. v. Sandoz, Inc., Civ. 08-5974 (GEB), 2010 WL 1957640, at *5 (D.N.J. May 17, 2010) ("[i]rreparable harm must be established as a separate element, independent of any showing of likelihood of success; irreparable harm can no longer be presumed") (citing eBay); Ferring Pharm. Inc. v. Watson Pharm., Civ. 12-5824 (DMC), 2013 WL 1405226, at *4 (D.N.J. Apr. 4, 2013) (in Lanham Act false advertising case, holding that "[i]rreparable harm cannot be presumed, and must be established as a separate element, independent of any showing of likelihood of success. . . . Failure to establish irreparable injury automatically results in denial of a preliminary injunction") (citations omitted); Am. Beverage Corp. v. Diageo N. Am., Inc., 936 F. Supp. 2d 555, 613 (W.D. Pa. 2013) ("Following eBay, therefore, courts sitting in equity are no longer to presume simply that a likelihood of success on the

merits demonstrates irreparable harm. Instead, plaintiffs must demonstrate that the potential harm in absence of an injunction cannot be compensated by monetary damages alone").

Plaintiff argues that eBay is inapplicable because it involved a patent, not a trademark, case and a permanent, not preliminary, injunction and because the presumption in trademark cases only extends to one of the four factors and is rebuttable. The Court is unpersuaded by these arguments. The basis of the eBay decision was not that patent cases and permanent injunctions are somehow unique; it was that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." eBay, 547 U.S. at 394. The eBay court held that "a major departure from the long tradition of equity practice should not be lightly implied" and that [n]othing in the Patent Act indicates that Congress intended such a departure." Id. at 391-92 (citations omitted). Likewise, the Lanham Act does not indicate that Congress intended a departure from the principles of equity; in fact, quite the opposite since the Lanham Act gives courts the "power to grant injunctions, according to the principles of equity . . . ." 15 U.S.C. § 1116(a). Finally, Plaintiff's argument that trademark

cases are unique because the irreparable harm presumption can be rebutted is equally unpersuasive. "eBay's central lesson is that, unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard." Salinger, 607 F.3d at 78 n.7 (quoting eBay, 547 U.S. at 391-94). The Court will not presume that Plaintiff has established irreparable harm.[12]

In addition, the Supreme Court "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction," not merely possible. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (emphasis in original). The Winter court explained that "[i]ssuing a preliminary injunction based only on a possibility

---

[12] Plaintiff cites three post-eBay cases in which this Court cited Opticians and held that "once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury . . . . because a likelihood of confusion has been shown, the requirement of irreparable harm has been met." Coach, Inc. v. Fashion Paradise, LLC, Civ. 10-4888 (JBS), 2012 WL 194092, at *9 (D.N.J. Jan. 20, 2012); Coach, Inc. v. Bags & Accessories, Civ. 10-2555 (JBS), 2011 WL 1882403, at *9 (D.N.J. May 17, 2011); Coach, Inc. v. Ocean Point Gifts, Civ. 09-4215 (JBS), 2010 WL 2521444, at *9 (D.N.J. June 14, 2010) (identical quotation in each case) (citations omitted). Each of those cases involved default judgment and did not discuss eBay's impact on Opticians. Furthermore, based on the particular facts of those cases, plaintiff Coach Inc. undoubtedly showed a likelihood of irreparable harm.

of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. Plaintiff argues that Winter is distinguishable because "that case did not involve trademark or trade dress or intellectual property." (Pl. reply at 17.) This argument is unpersuasive. The Winter court did not indicate that the injunction standard should vary depending on the subject matter; in fact, the Supreme Court cited its "frequently reiterated standard" that irreparable injury must be likely. Winter, 555 U.S. at 22. And, as discussed supra, the lesson from eBay is that courts must apply the principles of equity unless there is congressional direction otherwise.

The Court will now analyze whether Plaintiff has satisfied the irreparable harm standard.

### 2. Likelihood of Irreparable Harm

Plaintiff has not shown that it is likely to suffer irreparable harm, i.e., harm that cannot be remedied with monetary damages, if an injunction does not issue.

Plaintiff argues that "Buzz Bee cannot control the quality of Swimways goods sold under the infringing trade dress, which could readily be confused with Buzz Bee's" and that "[i]t is not likely that Buzz Bee could recover the goodwill lost due to Swimways' infringement." (Pl. mot. at 34-35.) But Plaintiff has

58

not shown that any consumers blame Buzz Bee for or associate
Buzz Bee with Swimways' product failures, if any.

Buzz Bee president Zimmerman also asserts that now is the
prime season for consumer purchase of water shooting toys and
that retail buyers will select water shooting toys for the 2015
season between now and July. (Id. ¶ 57.) It is unclear how this
factor shows irreparable harm. Zimmerman acknowledged that "[i]t
is unlikely that Buzz Bee's relationship with Target will ever
recover . . . ." (Id. ¶ 53.) It does not appear, therefore, that
an injunction would impact whether Buzz Bee could sell its
products through Target in 2015, and Plaintiff has not shown how
Swimways' alleged infringement would impact Plaintiff's
relationship with other retailers. In fact, Swimways' vice-
president Balam stated that Swimways agreed to offer its FLOOD
FORCE line exclusively through Target, which indicates that
Swimways will not be sending its allegedly infringing products
to other retailers. In addition, Plaintiff has not provided
evidence that any retailer has indicated that its willingness to
sell Buzz Bee's products depends on the exclusivity of Buzz
Bee's designs or on Plaintiff's ability to cease Swimways'
production of the FLOOD FORCE line.

Zimmerman also asserts that, if Swimways continues to sell
infringing products, competitors, Chinese manufacturers, and
U.S. retail buyers will consider Buzz Bee's trade dress to be

"open market," meaning that Buzz Bee's products will be copied with impunity for the 2015 season, Buzz Bee will be unable to prevent future and ongoing infringement, Buzz Bee will be unable to regain the goodwill in its products' appearance, and all of Buzz Bee's work will be lost. (Zimmerman 2nd Decl. ¶ 58.) Plaintiff has not shown that these events are <u>likely</u> to occur without an injunction.

Plaintiff must show that irreparable harm is likely, not merely possible, and it has not done so.

In terms of irreparable harm to Defendants, Swimways' vice president Balam stated that sales for waterguns are concentrated in the summer, styles vary yearly, and styles from previous years may be difficult to sell. (Balam ¶ 30.) In other words, if a preliminary injunction issues, Balam claims Defendants may be unable to sell their products in the future. Buzz Bee's president Zimmerman disputes Balam's assertion: "Balam's statement . . . that it may be difficult to sell models of water shooting toys from prior seasons is surprising, given the fact that Swimways is offering products copied from Buzz Bee that have been on sale for many seasons." (Zimmerman 2nd Decl. ¶ 42.)

In sum, while Defendants' assertions about probable irreparable harm are not compelling, Plaintiff has not shown that it is likely to suffer irreparable harm and, therefore, this element does not favor Plaintiff.

### C. Public Interest

"[T]he most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." <u>Kos Pharm.</u>, 369 F.3d at 730. This factor does not favor granting the injunction because, while Plaintiff has shown that consumers may not distinguish between the two product lines, Plaintiff has not shown that consumers are likely to be confused as to the source or brand of the particular product they purchase.

### V.   CONCLUSION

This case presents a challenging analysis for the Court, particularly because Defendants' products are so similar to Plaintiff's products. But a preliminary injunction is an extraordinary remedy that should only be used in limited circumstances. Plaintiff has not shown that these circumstances warrant an injunction. In particular, Plaintiff has not shown a likelihood of success on the merits and has not shown that, absent an injunction, irreparable harm is likely. Plaintiff's motion will be denied. If Plaintiff believes that it can remedy these deficiencies after discovery is undertaken, Plaintiff is, of course, free to renew its motion.

An accompanying Order will be entered.


**May 15, 2014**                              **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              Chief U.S. District Judge